## Case No. 288.

### The AMERICA.

[2 West. Law Month. 279; 16 Law Rep. 264; 29 Hunt, Mer. Mag. 459.]

District Court, N. D. New York. 1853.

COLLISION—LIENS ON VESSELS—ORDER OF PAYMENT.

1. In a case of collision, the owner of a vessel injured has a maritime lien upon the offending vessel for the amount of the damages to which such owner is entitled in consequence of the collision; and this lien is of equal rank with those of material-men, bottomry-bond holders, and others, whose claims rest upon the necessities of the ship or the hazards of navigation.

[Cited in Beane v. The Mayurka, Case No. 1,175; The China, 7 Wall. (74 U. S.) 68; The Avon, Case No. 680. Disapproved in Force v. The Pride of the Ocean, 3 Fed. 166; The F. H. Stanwood, 1 C. C. A. 385, 49 Fed. 580.]

2. A creditor holding a maritime lien, who proceeds in rem in a court of admiralty, and obtains a final decree in his favor, before another creditor, having a co-ordinate or equal claim, has instituted proceeding or intervened in the prior suit to enforce his lien, is entitled to be paid his debt in preference to the creditor who has asserted no right until after the entry of such final decree.

[Cited in The Lady Boone, 21 Fed. 732. Distinguished in The City of Tawas. 3 Fed. 173. Disapproved in The E. A. Barnard, 2 Fed. 719.]

3. Such final decree may, however, be opened on the application of the apparently dilatory creditor, if such application be made within a reasonable time, while the fund still remains in court, and under circumstances which would excuse a default, and induce the court to open a decree for the purpose of enabling a proper claimant to set up a meritorious defence to the demand on which the decree was made.

4. If no preference has been obtained by the actual making of a decree, as above mentioned, the maritime liens, of the same class, or rank

of privilege, upon a ship sold under the order of a court of admiralty, should, as a general rule, be paid out of the proceeds in the inverse order of the dates of the creation of such liens.

[Cited in The Fanny, Case No. 4,638; The E. A. Barnard, 2 Fed. 719; The Frank G. Fowler, 8 Fed. 333; The Lady Boone, 21 Fed. 732. Disapproved in The Minnie R. Childs, Case No. 9,640; Force v. The Pride of the Ocean, 3 Fed. 166; The Frank G. Fowler, 17 Fed. 653; The J. W. Tucker, 20 Fed. 131; The F. H. Stanwood, 1 C. C. A. 385, 49 Fed. 580.]

5. Seamen's wages for the same voyage, and perhaps for the same season of navigation upon the great lakes, are, however, generally to be preferred to claims of material-men, &c.

6. Maritime liens arising out of contracts of affreightment, and other maritime liens not resting upon the necessities of the ship, or the hazards of navigation, should be assigned to a class different from that which embraces the claims of material-men, bottomry-bond holders, salvors, and collision claimants; and such liens should be postponed until all the liens belonging to superior classes, and arising at the same time, are paid.

In admiralty.

John Ganson, for libellant and petitioner.

E. Cook, T. C. Welch, I. T. Williams, and P. Hoffman, for sundry claimants opposing the petition.

HALL, District Judge. This is a cause of collision and damage. The libel was filed by De Witt C. Bancroft, on the 16th July, 1852; and on the 17th July the America was arrested on the warrant, issued in this suit, against the steamboat, her tackle, apparel and furniture. The collision occurred on Lake Erie, on the 12th July, 1852, during the last trip made by the America prior to her arrest. The office of the clerk of this court was then at Auburn, and there was consequently no unnecessary delay, on the part of the libellant, in instituting these proceedings; but the America, having been herself damaged by the collision, was on the marine railway, undergoing repairs at the time of her arrest. The vessel of the libellant was sunk by the collision, and totally lost. She was of the value of more than $23,000; but this court having determined that those in charge of her were not entirely free from fault, divided the damages sustained by the colliding vessels, and on the 14th December, 1852, awarded to the libellant the sum of $10,000 damages, and his costs. Pending the proceedings in this suit, and before any final decree therein, sundry seamen commenced original suits, or intervened in this suit, for the recovery of their wages as mariners on board the America; and sundry material-men instituted proceedings for the recovery of their respective claims. Proceedings were also instituted by Patrick Carroll, on the 2d October, 1852, to recover the damages sustained by him as the owner of a vessel which was injured by a collision with the America on the 11th July, 1852. The America was sold under an order of this court, on the 10th September, 1852. The

proceeds of the sale, amounting to $10,950, were brought into the registry; and, soon after, applications were made for the payment of the decrees which had been rendered in favor of the seamen for their wages. These applications were not opposed. They were at once granted, and those decrees paid. Applications for the payment of several of the decrees obtained by material-men were subsequently made, and were opposed by the collision-claimants. After a slight examination of the questions involved in the applications, the decrees of the material-men whose liens attached subsequently to the collision with the vessel of the libellant, and who had either the possession of the America, and common law liens, or liens under the statute of this state, declaring that such liens upon a ship or vessel "shall be preferred to all liens thereon except mariner's wages," were also directed to be paid.—The claims of the other material-men having been held under advisement, the libellant in this case subsequently presented his petition, claiming the whole residue of the fund in court, upon the ground that he was entitled to a preference over all the other parties who had instituted original suits against the America, or intervened in this suit, for the purpose of obtaining payment of their respective claims.

The several questions raised in this case, in respect to the right of preference, or priority of payment, claimed by the respective parties, were elaborately and ably argued, and have been the subject of much examination and reflection. As questions depending upon the same principles are likely hereafter to arise in this district, it is deemed proper to express an opinion upon most of the questions argued, although some of them are not necessarily determined by the decision about to be pronounced. Some of these questions have not, it is believed, been directly and expressly determined by any court whose judgments are binding upon this; and in respect to some of them, apparently conflicting decisions have been made in different districts in the United States.—Under such circumstances, this court may, perhaps, be justified in attempting to establish, for its own guidance, some general principles in regard to the distribution of funds claimed by adverse parties under different maritime liens, until some authoritative adjudication in a higher court shall prescribe a different rule for its adoption, or until increased experience and more mature consideration shall produce a conviction that such principles ought no longer to be maintained. With these views I shall proceed to an examination of the questions arising in the present case.

The first question to be considered is, whether the libellant had, in consequence of the collision, a maritime lien upon the America; or, if he had not a technical maritime lien, such as exists in the case of contracts giving a lien under the general maritime law, whether he had a charge upon the America in consequence of the collision, similar in character and effect to such a maritime lien; giving him substantially the same rights and entitling him to substantially the same remedies.

The cases of The Volant, 1 W. Rob. [Adm.] 383, and of The Creole, Fland. Mar. Law, § 380, note, were cited by the counsel opposing the libellant's petition. In the case of The Volant, Dr. Lushington is reported to have said: "By the ancient maritime law, the owners of a vessel doing damage were bound to make good the loss to the owners of the other vessel, although it might exceed the value of their own vessel and the freight. For the purpose of enforcing this obligation, the owners of the damaged vessel might resort either to the courts of common law or to the court of admiralty; and if they preferred the latter, they had their choice of three modes of proceeding, viz: Against the owners, or against the master personally, or by a proceeding in rem against the ship itself. The court of admiralty has jurisdiction over the whole subject-matter of damage on the high seas, and the arrest of a vessel is only one mode of proceeding. The damage confers no lien upon the ship, but an arrest offers the greatest security for obtaining substantial justice in furnishing a security for prompt and immediate payment." "Looking to a proceeding by the arrest of the vessel, it is clear, that, if no appearance is given to the warrant arresting the ship, there can be no proceedings against the owners; for the court can not know who are the owners; and the court can not exercise any power over persons not before the court and never cited to appear: The decree must be confined exclusively to the ship." In the case of The Creole, the learned judge of the eastern district of Pennsylvania, said: "There is, properly speaking, no lien in a case of collision, and can not be, for the subject is tort. Yet the remedy, according to the ancient and practically approved opinion in this district, is not affected by a change of property in the thing: No one has contended here, that his vessel was free of liability for a collision, because he had purchased her after it took place." In each of these cases, the right to proceed in rem against the vessel, by whose fault the damage was occasioned, was recognized and enforced; and, in the latter, this right was declared to continue even against a subsequent bona fide purchaser without notice. Other cases in the English and American courts of admiralty have sanctioned the same doctrines, and it has been declared that the rights of the collision-claimant should prevail over those of subsequent bona fide purchasers, and bottomry-bond holders, mariners and others, whose liens attached prior to the collision. It is, perhaps, not very material, after these decisions, to inquire

whether the right of the collision-claimant, as recognized and enforced in these courts, gives a technical maritime lien upon the vessel by which the damage was produced; but I can perceive no impropriety in denominating the fixed and acknowledged right of priority of payment over the rights of general creditors, subsequent purchasers and others, which is given to the collision-claimant, a maritime lien. It has been sometimes so denominated by distinguished admiralty judges, as some of the cases hereafter referred to will abundantly show. In the case of Edwards v. Stockton, [Case No. 4,297,] Judge Randall, of the eastern district of Pennsylvania, declared it to be "the generally received opinion of courts of admiralty," that "whenever one vessel does damage to another, within the admiralty and maritime jurisdiction, the offending vessel becomes hypothecated to the vessel and cargo sustaining the injury to repair the damages occasioned by the collision and the injured persons have a lien, or privilege, upon the guilty party, by the general maritime law of nations, to the extent of the injury sustained." See, also, 3 N. Y. Leg. Obs. 61. In the case of Boon v. The Hornet, [Case No. 1,640,] the late Judge Hopkinson declared: "There could be no suit in rem, unless there was a charge or lien upon the thing to answer for the debt;" and this, taken in connection with the acknowledged right of a libellant in a cause of collision and damage to proceed in rem, is an authority in favor of the existence of a maritime lien in behalf of a collision-claimant.

An able writer in the London Law Magazine, for February, 1853, whose article is published in the Law Reporter, for May last, (16 Law Rep. 1,) says: "Maritime liens, like all other obligations, arise either ex contractu and quasi ex contractu, or ex delicto and quasi ex delicto. In the first category are wages, pilotage, towage, salvage and bottomry-bonds. In the other is damage by reason of collision." Again: "In damage, which is a lien ex delicto," &c., "and as the law has made it a lien," &c. In the case of Harmer v. Bell,[1] (24th April, 1852,) Lord Chief Justice Jervis said: "A maritime lien is well defined by Lord Tenterden to mean, 'a claim or privilege upon a thing, to be carried into effect by legal process;'" and Mr. Justice Story, in 1 Sum. 78, [The Nestor, Case No. 10,126,] explains that process to be a proceeding in rem, and adds, that wherever a lien or claim is given upon the thing, that the admiralty enforces it by a proceeding in rem, and indeed is the only

court competent to enforce it. "A maritime lien is the foundation of all the proceedings in rem—a process to make perfect a right inchoate from the moment the lien attaches; and, whilst it must be admitted that, when such a lien exists, a proceeding in rem may be had, it will be found to be equally true, that in all cases when a proceeding in rem is the proper course, there a maritime lien exists, which gives a privilege or claim upon the thing, to be carried into effect by legal process." 15 Law Rep. 560. And see The Rebecca, [Case No. 11,619.] After a careful consideration of these and other authorities, I am unable to perceive any substantial difference between the settled right of the collision-claimant to enforce the payment of his damages by proceedings in rem, in disregard of the claims of subsequent bona fide purchasers without notice, prior bottomry-bond holders, and mortgagees of the offending vessel, and the right, which, in the case of material-men, &c., is constantly denominated a maritime lien. In neither case is there a lien in the common law sense of that term, as applied to personal property, but the term maritime lien has been long used, and its signification is well settled; as well, perhaps, as that of the term common law lien. It is constantly and legitimately used as expressing the existence of that privilege, or right of priority of payment, which seamen, pilots, material-men, and bottomry-bond holders, enforce in courts of admiralty, by proceedings in rem; and, in my judgment, there is manifest propriety, as well as convenience, in the use of the term to indicate the existence of the like privilege and right which accrues to the owners of vessels damaged by collision.[2]

Being satisfied that the libellant had a maritime lien upon the America, for the amount of damages to which he was entitled in consequence of the collision, or else a charge or privilege which gave him sub-

---

[1] This case was argued on appeal before the judicial committee of the privy council, and is fully reported in the 22d volume of Little & Brown's series of Law and Equity Reports, page 72, et sequitur. The first statement of the points decided, is, "Damage creates a lien on the ship causing the collision." I had not the full report at the time this opinion was written. H.

[2] Since this opinion was written, a report of the case of General Mut. Ins. Co. v. Sherwood, 14 How. [55 U. S.] 351, decided by the supreme court of the United States at its last term, has fallen under my observation. In that case, Sherwood, the owner of the brig Emily, brought his action against the insurance company, upon a policy of insurance, to recover the damages which had been decreed against the Emily by a court of admiralty, in consequence of a collision between the brig and the schooner Virginia, occasioned by the fault of those having the Emily in charge. Mr. Justice Curtis, in delivering the opinion of the court, said: "The loss was the existence of a lien on the vessel insured, securing a valid claim for damages, and the consequent diminution of the value of that vessel. In other words, the owners of the Virginia obtained a lien on the vessel insured, as a security for the payment of damages done to them for a maritime tort, whereby their property was injured." And see Harmer v. Bell, 22 Eng. Law & Eq. 72. Also The New World v. King, 16 How. [57 U. S.] 469, where the vessel was made liable in Spain to a passenger injured by an explosion of a boiler through the negligence of the engineer.

stantially the same rights and remedies, it becomes important to consider the claims of priority and preference which have been urged by the advocates for the respective parties in interest. The advocate for the libellant insisted, upon the argument, that his right of preference over all the other claimants, except seamen suing for their wages, was authoritatively settled by the opinion of Mr. Justice Nelson, in the case of The Globe, [Case No. 5,483;] but I do not so regard it. It is true that Mr. Justice Nelson, in that case, referred with approbation to the case of The Triumph, [Case No. 14,182,] decided in the southern district of New-York in 1841, and in which it was said by the learned judge of that district, "that maritime liens, or what are usually so denominated, are to be discharged and satisfied in the order in which the warrants of arrest were served upon the property, whether the vessel in kind or her proceeds in court; and that each action, with its appropriate costs, comes upon the fund, according to the period of its commencement." But this reference, by Mr. Justice Nelson, to the case of The Triumph, [supra,] is not of such a character as to make that case binding upon this court upon the ground that its doctrines were adopted and confirmed in the case of The Globe, [supra.] The latter case was an appeal from a decree of my predecessor; and in my judgment, the question was one of title only. The question of preference, or right of priority of payment, did not arise. The claimant in that case obtained his title to The Globe, [supra,] through a judicial sale, made in Ohio, and founded upon proceedings in rem, in one of the courts of that state. These proceedings were in accordance with a statute of Ohio, which gave material-men a right to proceed in the Ohio state courts, against the vessel itself, as a defendant, very much in the manner of the ordinary proceeding in rem in this court. The arrest and sale of the vessel, under the proceeding in Ohio, were subsequent to the creation of the debt or lien upon which the libellant proceeded in the district court; and if the proceeding in Ohio was a valid proceeding in rem, to which all persons having an interest in the ship were substantially parties, the right acquired by the claimant under a sale authorized by such proceedings was clearly good and available as against all parties whose rights accrued prior to such sale. In other words, the purchaser at a sale under such proceedings obtained the same title which is obtained by a purchaser under proceedings in rem in this court. All persons who had maritime or other liens on the property at the time of the sale, were therefore bound to look only to the proceeds of such sale, and were entitled to payment of their liens out of such proceeds, either pro rata, or in such order of priority as might be established

by the court making the distribution. If the proceeding in rem, in the Ohio court, was valid and binding, the person took the property discharged of all liens, and the question of priority of lien was one which could only be raised by the different claimants of the fund produced by the sale. If the libellant in the district court had a lien upon the vessel at the time she was seized under the process of the Ohio court, he should have established his right in the latter court, and received his just share of the proceeds of the sale, and his failure to do so could give him no right against The Globe in the hands of the purchaser at the Ohio sale; nor would it invalidate the proceedings, in that state, under its statutes.

Mr. Justice Nelson did not, therefore, necessarily consider the question of preference; and the case of The Triumph [supra] can not be regarded as conclusive authority binding the judgment of this court. It nevertheless demands that grave and respectful consideration which is always due to the decisions of the very learned and able judge of the southern district. Such decisions, when not opposed by decisions in other districts, or in the English courts of admiralty, I shall certainly deem it my duty to follow, until entirely convinced that they are inconsistent with well established principles; but the decisions hereafter alluded to, appear to me to authorize the adoption in the present case, of such rule as shall after mature deliberation, appear to be best sustained by authority, and by the principles of equity and commercial policy established and acted upon in the admiralty courts. It is understood that my learned predecessor uniformly adopted a different rule from that declared in the case of The Triumph, [supra,] and that, in cases of deficiency of proceeds, he ordered debts of the same class to be paid pro rata, without regard (so far as the clerk of the court can now recollect,) to the time when suits, pending at the same time, were commenced.[3] In the cases of The Paragon, [Case No. 10,708,] and The Phoebe, [Case No. 11,065,] the very learned judge in the Maine district intimated that maritime liens of the same rank of privilege should be paid concurrently, without regard to the time the several claimants commenced

---

[3] In the case of The John Fehrman, 20 Eng. Law & Eq. 648, the court allowed a bottomry-bond holder, who had caused the ship to be arrested under a libel filed on his bond, to pay, for the purpose of saving costs, the amount claimed in five actions subsequently commenced, three of which were for wages, one for pilotage, and one for towage. Certainly, the bond holder could have no interest in paying these claims on which suits were commenced subsequent to his own, if by the prior commencement of his suit he had obtained a preference over the claims for wages, pilotage and towage. It is presumed from the fact that most of these claims were for pilotage and towage, that these claims accrued on the return of the ship after the execution of the bottomry-bond, and were therefore entitled to a preference over it.

their proceedings; and no case has been referred to in which the case of The Triumph [supra] has been followed by other judges of the district courts. The questions in this case can not therefore be regarded as settled by the cases cited, and they must be determined upon authority and principle, giving due weight and consideration to each. In examining the authorities, it has been my object to discover the principles upon which the several decisions were made, and, if possible, to extract from them some general rule decisive of the rights of the parties now before me.

It is first to be observed, that the parties opposing the libellant's petition had instituted their proceedings before the final decree in his favor. If it had been otherwise, they would be postponed to the libellant and excluded from a participation in the distribution; for the reason that the creditor who obtains his final decree, before other creditors having co-ordinate or equal claims have brought their actions, is entitled to be paid his debt in preference to those who do not assert their claims until after the entry of such final decree. This rule prevails both at law and in equity, as well as in the admiralty courts. The Saracen, 2 W. Rob. [Adm.] 451; 16 Law Rep. May, 1853, pp. 1, 2. In the courts of admiralty this would seem to result from the course of their practice and the peculiar nature of their proceedings. A ship is arrested at the suit of the party first proceeding against it, and the proceeding is in rem, against the ship itself, and against all persons having or claiming any right or interest therein. Hence all persons have a right to intervene for their interests, and the suit is, in substance and effect, against such persons, as much as though they were specially named as defendants. They are bound by the proceedings and decree; and by a sale of the res, under such proceedings, their rights therein are effectually extinguished. By their failure to intervene for the protection of their own interests, they tacitly assent to a decree which establishes the right of the libellant to enforce his lien upon the property seized, and effectually appropriates it to the payment of his claim. The case of The Triumph, [supra,] perhaps, proceeded upon this principle; and if the final decrees there referred to were successively obtained, each before the proceedings next commenced were instituted, the decision would be consistent with the rules of preference, on account of the priority of proceeding, which this court considers as established. In case of a final decree, in favor of one creditor, before another having an equal paramount claim commences proceedings or intervenes for the protection of his interest, such may be opened, on sufficient cause shown, for the purpose of allowing the apparently tardy creditor to assert his claim. The intervention of a creditor for the purpose of obtaining payment of his claim concurrently with, or in exclusion of, that of the libellant, is in the nature of a defence to the adverse claim of the libellant; and the same circumstances, which would induce the court to excuse a default and open a decree to let in a defence, will ordinarily induce it to open a decree for the purpose of allowing a creditor whose right would be barred by such decree, to appear and establish the right claimed. This will prevent the occurrence of gross injustice by reason of the application of a rule which favors a diligent creditor, and which courts of admiralty, from their peculiar practice and proceedings, must necessarily adopt. If no preference is obtained by the actual making of a decree, I am inclined to think that maritime liens of the same class, rank or privilege, existing upon a ship sold under the order of a court of admiralty, should, as a general rule, be paid out of the proceeds of such ship in the inverse order of the dates of their creation. The practical application of this general rule, to particular cases, may not be free from difficulty, and the rule itself must be subject to exceptions; but, in my judgment, it ought never to be departed from, except for cogent reasons. And it is believed that the principle of this rule will be found to be the basis upon which numerous decisions, both in this country and England, must rest. The adoption of such general rule is not inconsistent with that difference in rank and the classification of maritime liens, which have been recognized in the admiralty courts; and indeed the recognition of different classes of maritime liens is necessary to its just and successful operation.

Seamen's wages have almost uniformly been deemed to constitute a peculiar class, and claims for seamen's wages have been preferred to most other claims in all cases where there had been no unreasonable delay in instituting proceedings for their recovery. As between themselves, the wages of seamen for the last voyage have been preferred to those due for prior voyages of the same ship, and, it is believed, upon the general principle before referred to. In some cases, other claims, such as claims in causes of collision, and salvage, and bottomry claims, have been preferred to seamen's wages; but these cases proceeded upon the same general principle, the preferred claims having accrued subsequent to the claims for wages. Another, and perhaps the most numerous and important, class of maritime liens, are those which grow out of the necessities of the ship and the hazards of navigation. This class embraces the claims of salvors, bottomry-bond holders, material-men, and parties entitled to damages occasioned by collision. Pilotage, towage and wharfage, should also be included. For obvious reasons, the reports of the English admiralty do not afford any light in respect to the claims of material-men, and the order of their payment; but, in respect to the other claims of the charac-

ter just alluded to, several reported cases may be found in the English, as well as in the American reports. It is, perhaps, not too much to say, that the reported decisions have not satisfactorily established any fixed rule inconsistent with, if they are not sufficient to sustain, the general rule under consideration. Before adverting to these decisions, it may be useful to refer to the reason and policy by which the maritime liens belonging to this class are upheld, and which favor the adoption of the rule proposed. And first, in respect to those which arise ex contractu.

By the general maritime law, these liens exist only where the credit was given to the ship, either alone, or in connection with her master, or owners, or both. If it appear that the credit was given to the master and owners, or either, exclusively, the ship is not liable. Whenever the lien attaches, credit is given to the ship, and this must necessarily be to the ship as she stands, for the credit is given in a foreign port, where the creditor can not ascertain whether any, and, if any, what, maritime liens are existing against her. Hence, where the necessity which upholds the lien is established, the lien created when the credit is obtained should bind all the interests which centre in the ship; to the preservation and success of which the credit is essential. These liens rest upon the necessities of the ship, and their creation is required to secure alike the interests of the owners, and those having prior maritime liens upon the vessel. Neither the bottomry-bond holder nor the material-man can enforce his claim without averring this necessity, and proving it, if it be denied by the other parties in interest. These liens, when large, are generally created in cases of accident or distress, and when the creation of such lien in favor of the material-men or bottomry-bond holders affords the only means of saving the ship from sacrifice, and enabling it to earn its freight; thereby preserving for the benefit of all, the property to which all must look for payment, according to their respective rights. Suppose a vessel on a voyage from Boston to Vera Cruz and back, should necessarily subject herself to liens of material-men, or take up money on bottomry, in the latter port, and, on her return voyage, should suffer damage in a storm, and find it necessary to subject herself to similar liens in Charleston, and again, in consequence of further accidents, at Norfolk and New-York: Is it not clear, (the necessity being conceded,) that these liens ought to have preference in the inverse order of their creation? And suppose that important salvage services were afterwards rendered her, ought not the salvage compensation to be paid in preference to the prior claims?

The maritime lien is founded in principles of international and commercial policy, and it is allowed for the purpose of giving credit to the ship, to enable the master to obtain, in a foreign port, the funds necessary to the safe and successful prosecution of his voyage, whenever those funds can not be obtained on the credit of the master and owners. It is therefore important that these questions of preference should be so settled as to maintain and secure this credit. The liens thus created are generally discharged by the earned freight, at the completion of the voyage; by freight which would, in very many instances, be wholly lost, and the ship itself sacrificed, if the necessary credit could not be obtained whenever the necessity for such credit might arise. If the last lien created under such necessity has a preference over every prior lien, except for seamen's wages, and if those, with the small claims, such as for pilotage, and towage, subsequently accruing, are all that are likely to take preference, the credit can generally be obtained; for the security will, in ordinary cases, be abundant, if the lien be enforced within a reasonable time after the voyage is completed. And this rule, while it will enable the ship to obtain the necessary credit, when in distress, without a stipulation for a ruinous premium, will also tend to prevent unreasonable delays in enforcing maritime liens, and their consequent unreasonable accumulation; and will, in most, if not all respects, best promote the interests of commerce. This rule has long been established between different bottomry-bond holders, and there is little substantial difference between the cases of material-men and lenders on bottomry. The latter, it is true, stand upon an express hypothecation, while the former rely on the implied hypothecation of the maritime law. But their claims are of equal validity, and should be subject to the same general rules of priority and preference, unless some other and more cogent reason to the contrary can be found. The material-man retains, and relies upon, the personal liability of the master and owners, while the bottomry-bond holder does not: The latter puts his money at hazard, and the payment of his debt is made to depend upon the safe arrival of the ship; but for each of these disadvantages, and the risk he assumes, he is allowed to reserve a fair and full equivalent in the marine interest for which he always stipulates. For this reason, the material-man, who secures to himself only common interest, and requires no extraordinary premium for the less but not inconsiderable risk which he necessarily runs, should, when the necessity which supports his claim is fully established, be placed upon the same footing, and entitled to equal equities, with the lender upon bottomry. Indeed, the money raised by bottomry is not unfrequently paid to the material-man, and it would be difficult to offer any substantial reason why the mechanic, or small dealer, who supplies labor and materials, should not be equally favored with the capitalist, or wealthy merchant, who lends money with a

clear knowledge of the risk he assumes, and secures to himself an ample interest for his money, and a satisfactory premium for the hazard to which it is subjected. Neither of these differences, nor any others that, at present, occur to me, are of such a character as to require that there should be, so far as the question of preference is concerned, any substantial distinction made between the claims of material-men and lenders upon bottomry.

The privilege of a successful suitor in a case of damage by collision, rests upon other grounds. "It is given to the creditor because the law favors him over others for having suffered a wrong—a loss imposed by the delictum of others—the master and crew of the vessel in fault. The damage, when recovered, operates not only as a civil indemnification, but as a quasi penalty against the wrong-doer; and it is for the public weal that the penalty shall always be enforced, so that such wrong may not, by passing unredressed, incite others to a similar negligence in navigation."—16 Law Rep. 6. The creditor in damage has no option, no caution to exercise; the creditor on mortgage or bottomry, or whose claim is for materials furnished, has. He may consider all possible risks, and give credit or not, as he may think most advisable for his interest. He has an alternative; the suitor in damage has none.—The Aline, 1 W. Rob. [Adm.] 118. These, and other considerations founded in justice and a wise commercial policy, are sufficient to give to the successful suitor, in a cause of collision and damage, a lien of as high a rank as that conceded to lenders on bottomry; and the English admiralty has uniformly placed such suitor in at least as favorable a position as that occupied by the bottomry creditor. The claims of the libellants in the collision cases will therefore be considered as of equal rank with those of material-men, and the general rule of preference, before stated, will be adopted, as just in principle, as required by considerations of commercial policy, and as the best sustained by authority. Not having had leisure to digest and arrange the authorities which sanction the adoption of this general rule, and which give a priority to seamen's wages, I shall refer to but a portion of the cases, and shall not attempt their orderly arrangement. Seamen's wages are preferred to most other claims, in all courts of admiralty. They are hard-earned, and liable to many contingencies; and few claims are more highly favored, or more carefully and zealously protected by law. The sailor's claim is a sacred lien; and as long as a single plank of the ship remains, he is entitled, as against all other persons, to the proceeds, as a security for his wages; for by his labor the common pledge for all the debts is preserved. His demand for wages is preferred to all other demands, for the same reason that the last bottomry-bond is preferred to one of prior date. 3 Kent, Comm. 196, 197; Blaine v. The Charles Carter, 4 Cranch, [8 U. S.] 328, 332; The Virgin, 8 Pet. [33 U. S.] 538, 553; Pitman v. Hooper, [Case No. 11,185;] The Madonna D'Idra, 1 Dod. 37; The Sidney Cove, 2 Dod. 13.

Numerous cases have established the principle, that the last bottomry bond is entitled to priority over previous ones, as well as over prior mortgages; and such is the rule as universally applied in this country and in England. 3 Kent, Comm. 197; The Rhadamanthe, 1 Dod. 201; The Betsey, Id. 289; The Sidney Cove, 2 Dod. 1; The Eliza, 3 Hagg. [Adm.] 87; The Constancia, 4 Notes of Cas. 285. In the case of The Jerusalem, [Case No. 7,294,] it was held by Judge Story, that a sum due for repairs made subsequent to the execution of a bottomry bond, should be paid in preference to the claim of the bond-holder, because the repairs were necessary to the security of the ship, and increased her value. And he declared that the case was analogous to that of a second bottomry-bond, or the lien of seamen's wages, which had always been held to have a priority of claim, though posterior in time to the first bottomry-bond.[4] In the case of The St. Jago de Cuba, 9 Wheat. [22 U. S.] 409, Mr. Justice Johnson, in delivering the opinion of the court, said, that certain questions arising in that case were "all solved by a reference to the nature, origin and objects of maritime contracts. The precedence of forfeiture has never been carried further than to overreach common law contracts entered into by the owner; and it would be unreasonable to extend them further. The whole object of giving admiralty process and priority of payment to privileged creditors, is to furnish wings and legs to the forfeited hull to get back, for the benefit of all concerned; that is, to complete her voyage. There are two considerations that fully illustrate this position. It is not in the power of any one but the ship-master—not the owner himself—to give these implied liens on the vessel; and in every case the last lien will supersede the preceding. The last bottomry-bond will ride over all that precede it; and an abandonment to a salvor will supersede every prior claim." In that case the court decided, "That the fair claims of seamen, and subsequent material-men," were not overreached by the previous forfeiture of the vessel, in consequence of a violation of the laws of congress relating to the slave trade; and it is presumed that the whole court concurred in the above dictum of Mr. Justice Johnson. In the case of The Paragon, ubi supra, Judge Ware said: "Among privileged debts against a vessel, after the expenses of justice necessary to procure a con-

---

[4] See the comments of Chief Justice Jervis, on the case of The Aline, 1 W. Rob. [Adm.] 111, as reported in Harmer v. Bell, on appeal, 22 Eng. Law & Eq. (Little & Brown's Ed.) p. 72.

demnation and sale, and such charges as accrue for the preservation of the vessel, after she is brought into port, (1 Valin, Comm. 362; Code de Commerce, 191,) the wages of the crew hold the first rank, and are to be first paid. And so sacred is this privilege held, that the old ordinances say, that the savings of the wreck, to the last nail, are pledged for their payment. Consulat de la Mer. c. 138; Cleirac sur Jugemens d'Oleron, Arat. 8, note 31." And this preference is allowed the seamen for their wages, independently of the commercial policy of rewarding their exertions in saving the ship, and thus giving them an interest in its preservation. The priority of their privilege stands upon a general principle, affecting all privileged debts, that is, that among these creditors, he shall be preferred who has contributed most immediately to the preservation of the thing. 2 Valin, Comm. 12, liv. 3, tit. 5, art. 10. It is upon this principle that the last bottomry-bond is preferred to those of older date, and that repairs and supplies furnished a vessel in her last voyage take precedence of those furnished in a prior voyage, and that the wages of the crew are preferred to all other claims, because it is by their labors that the common pledge of all these debts has been preserved and brought to a place of safety. To all the creditors they may say, "salvam fecimus totius pignoris causam." The French law (Ordinance de la Marine, liv. 1, tit. 14, art. 16; Code de Commerce, 191) confines the priority of the seamen for their wages to those due for the last voyage, in conformity with the general rule applicable to privileged debts, that the last services which contribute to the preservation of the thing shall be first paid.[5]

The fact that Judge Ware said in the same case, "When all the debts hold the same rank of privilege, if the property is not sufficient to fully pay all, the rule is, that the creditors shall be paid concurrently, each in proportion to the amount of his demand," and also intimated in the case of The Phoebe, [Case No. 11,065,] that liens on the ship must be paid, "not in exclusion, but in concurrence with other liens, standing in the same degree of privilege," has not been overlooked, but considering the facts of those cases, and the language of the learned judge in the case of The Paragon, as first above quoted. it seems to be entirely clear that not only the character of the liens but the dates at which they attached, were, in the opinion of Judge Ware, to be taken into consideration in determining the order of preference, or "degree of privilege," of the respective claimants. In the case of The Paragon,

[supra,] the claims were three in number—two under bills of lading for the same voyage, and one for seamen's wages. The last was of course preferred, and the other two should, under the principles sought to be established in this case, have been paid concurrently, as directed by Judge Ware. The report shows that the different claimants in that case were not and could not have been held to be entitled to be paid concurrently, on the ground that their suits were simultaneously commenced.

In the case of The Phoebe, [supra,] the learned judge was speaking of a claim for wharfage, accruing while the vessel was under arrest; and this claim, as one of the expenses of the legal proceedings. should, of course, have been paid concurrently with the other expenses of such proceedings. It is also proper to remark in this connection, that the decisions of my learned predecessor, Judge Conkling, to which reference has already been made, may have been in cases where seamen were claiming wages for the same voyage; where materialmen had simultaneously given credit to the vessel, in furnishing materials for the same voyage or season; or where all the parties interested in the question of preference claimed under bills of lading for the same voyage. The cases referred to, as they were stated at the bar, may not have been inconsistent with the principles adopted in this case. In the case of The Aline, 1 W. Rob. [Adm.] 111, the successful suitor in the cause of collision and damage, was held to have a preferable claim to be indemnified, as against a mortgage or bondholder, prior to the period when the damage was done; but the court evidently entertained the most decided opinion, that if the repairs had been effected after the collision by a stranger, on the security of a bond of bottomry, the case would have been altogether different.[6] In the case of The Sabina, 7 Jur. 182, it was held that subsequent salvage took preference of seamen's wages, as but for the salvage, the seamen's lien

[5] The provisions of article 191, of the Code de Commerce, to which Judge Ware refers, afford abundant evidence that the inverse order of creation was the general rule of priority of payment in respect to privileged debts of the same character. where the proceeds of a vessel were insufficient to pay all the privileged debts against it.

[6] The court in fact decided that the holder of a bottomry bond, given to raise money expended in repairing the ship after collision, would be preferred to the collision-claimant; for it declared the collision-claimant to be entitled only to the value of the ship before the repairs were commenced, and that portion of the repairs which were done after the arrest took place, as against Mr. Day, who had advanced the expenses of such repairs under an agreement for a bottomry-bond; and it retained the residue of the proceeds in court to meet the demand of Mr. Day. Pages 122, 123. See also the comments of Chief Justice Jervis on the case of The Aline, in Harmer v. Bell, 22 Eng. Law & Eq. 72. In this case of The Aline, it might. perhaps, have been insisted by the owners of The Panther, who were the libellants in the collision suit, that they had obtained their decree before the party claiming on account of the expenditure for repairs had intervened for his interest. If such was the fact. and the question had been raised, the collision-claimant would, perhaps, have been declared entitled to the whole fund. See The Saracen. 2 W. Rob. [Adm.] 451, and [The Neptune,] 3 Knapp, 94.

would have been lost. In the case of The Exeter, 1 C. Rob. [Adm.] 173, 177,. where three several bottomry-bonds had been executed for moneys advanced on the same general invitation for loans on the security of the ship, but one bond bore a date different from that of the others, the late Lord Stowell declared that it appeared upon the evidence that the parties acted in privity and in concert with each other, as the money was advanced on the same general invitation, for the same repairs, in which all were equally interested, and on the same terms; and therefore held that the payments should be pro rata, without any preference. And this was in a case where it appeared that one of the bond-holders had commenced his suit long before the others instituted their proceedings. Indeed, no reference seems to be made, in the English reports, to the date of the commencement of proceedings pending at the same time, as affording a ground for giving to one claim a preference over others of the same class, except in the case of The Saracen, 2 W. Rob. [Adm.] 451. See the first case in 1 Swab. Adm. [The Clara,] where this case of The Saracen is referred to and approved. In that case the second action was entered after the hearing, and on the same day, (the 6th May, 1845,) that the decree was pronounced in favor of the libellant in the first suit; and the two suits were brought to recover the damages sustained by the libellants, in each, in consequence of the same collision. If the two suits had been commenced at the same time, it is clear that the libellants would have been entitled to be paid concurrently; but the court held that the party who had obtained a decree establishing his rights, before the other, having a claim of precisely the same character, and arising at the same time, had entered his action, could not be compelled to surrender the benefit of his decree by sharing it with the less diligent claimant. If the second libel had been filed before the hearing of the first, the court would, doubtless, have directed the two claims to be paid pro rata. The language of Dr. Lushington, in delivering his opinion in that case, appears to warrant that conclusion.[7] In the case of The Selina, 2 Notes

of Cas. 18, Dr. Lushington held that seamen's wages which accrued after the salvage services in that case had been rendered, were entitled to a preference over the claims of the salvors, and that a bottomry-bond holder; where the money was properly taken up, on bottomry, after the salvage services, was entitled to a like preference. In respect to sums due for wages prior to the salvage service, he declared that he entertained some doubt; and yet it is quite clear that the inclination of his mind was strongly in favor of giving a preference to the salvors.[8] In the case of The Constancia, 4 Notes of Cas. 285, 518, the last dated bottomry-bond was preferred; and two others, bearing the same date, were held to be entitled to be paid pro rata, without regard to the time when the bond holders severally instituted their proceedings. In this case, (page 518,) it appears that seamen's wages, earned both before and after the execution of bottomry-bonds, were preferred over them, and that subsequent towage and pilotage were also paid in preference to the bond holder's lien. In the same case, (4 Notes of Cas. 684,) Dr. Lushington held, that the lien of the bottomry-bond should not be defeated by a lien, prior in point of time, for goods thrown overboard for the safety of the ship. In the case of The Mary Ann, 9 Jur. 94, Dr. Lushington intimated a very decided opinion that seamen's wages on the outward voyage before a bottomry-bond was given, ought not to be preferred to the bond-holder's lien; but he declared that subsequent wages would have a preference. Subsequent salvage, seamen's wages, pilotage and towage, are entitled to a preference over a prior bottomry-bond. The Selina, 2 Notes of Cas. 18; The Favourite 2 C. Rob. [Adm.] 232; The Dowthorpe, 2 W. Rob. [Adm.] 79.

An able writer upon the subject of mari-

---

[7] The decree of the court of admiralty, in the case of The Saracen, by which the libellant in the second suit was denied a participation in the proceeds of sale, was appealed from. The decree was affirmed on the ground that the libellant in the first suit had obtained a preference by the decree pronounced before the second suit was instituted, and without any objection or claim on the part of the libellant in the second suit having been interposed in the first suit. During the hearing on appeal, Lord Campbell remarked: "This appeal must depend upon the question whether the judgment of May 1845, (the decree in the present suit establishing the libellant's right to recover. and referring it to the registrar and merchants to determine the amount of his damages,) was final, the proceeds of the ship still being in court." And again: "There is a judgment that

damages are to be paid. Does not that give the party a vested right?" 11 Jur. 255. The case on appeal is also reported in 6 Moore, P. C. p. 56, et seq., and this report shows that the effect of the prior decree, and not of the prior arrest, was the question upon which the case turned. Lord Campbell is reported to have said: "The principle of the common law is to give priority to a party obtaining a judgment." Again: "This appeal really resolves itself into the question whether the interlocutory decree of the 6th May, 1845, was a final decree." And again: "There is a judgment that damages are to be paid. Does not that give the party a vested right? The court below considered the ship and proceeds bound by the decree, the same as the land would be by a judgment at law." In delivering the opinion of the judges who heard the case on appeal, Lord Langdale said: "We are of the opinion that the sentence of the 6th May, 1845, is to be considered as a definitive sentence in favor of the defendants; and that the appellants. whose suit was not commenced till after the sentence was pronounced, are not entitled to participate in the proceeds of the ship in common with the respondents, by whose diligence, and at whose risk and expense, the damage has been pronounced for, the ship condemned, and the proceeds realized." 6 Moore, P. C. 75, 76.

[8] See The Sabina, 7 Jur. 182, as before cited.

time liens, in the very valuable article published in the Law Reporter, ubi supra, says, that "In liens ex contractu, this preference or right of priority, depends upon the dates at which the liens have attached. For the rule by which that priority is determined, requires that the demand or service for which that privilege is claimed, be posterior in date to other services or liens. The ground of this inversion of rule is just and obvious. In the hazardous trade of the sea, the services performed at the latest hour are the most efficacious in bringing the vessel and her freightage safely to their final destination. Each foregoing incumbrancer, therefore, is actually benefitted by means of the succeeding incumbrance, and the equity of the court of admiralty, in adjudicating cases of conflicting liens of this nature, takes that as the principle of its decisions." This writer states that, in the case of The Chimera, and other cases, seamen's wages were held not to take preference of the damages awarded in a cause of collision and damage, (see the article and cases cited in 16 Law Rep. 5, 9, 10,) but, after an examination of the cases of The Sidney Cove, 2 Dod. 13, The Louisa Bertha, 1 Eng. Law & Eq. 665, and our own authorities, I am inclined to think that seamen's wages for the same voyage, and probably for continuous services during the same season upon our lakes, should be preferred to the claims of the suitor in damage; though seamen's wages for a former voyage, or a former season, should not be so preferred. In England it seems to be still undecided, (same article, p. 9,) whether salvage of a vessel subsequently to that vessel's occasioning damage, is absorbed by the latter lien or has preference over it; but I see no reason for doubt upon that question. The last lien should be preferred, whether it attaches by reason of salvage services, or a collision. If a collision-claimant does not enforce his lien until the vessel is wrecked, or in danger of loss, and she is saved by the efforts of salvors, those salvors should certainly have the preferable claim;[2] and if after salvage services are effected, the vessel causes damage before the salvor's lien is enforced; the right of the salvors, like any other lien or proprietary interest, must be subject to the claims of the injured party.

In short, all parties, except seamen, holding ordinary maritime liens upon a vessel, are, to some extent, treated as though they had a proprietary interest in the ship; and their interests, whatever they may be, are subject

[2] In The Elizabeth and Jane, [Case No. 8,321,] Judge Ware said, in respect to the rights of a salvor of property found deserted: "The thing itself becomes bound to him for salvage, and he may retain it until he obtains satisfaction. This right of possession is necessarily exclusive of that of all other persons, because his interest in the thing takes priority of all other interests."

to all liens which the necessities of the ship, or a collision caused by the carelessness or misconduct of those in charge, may subsequently impose. It can hardly be necessary to say that the order of preference, now indicated, will be followed only when the liens belong to the same class, and that it is not intended to decide that bottomry-bonds, executed by the owner, or claims under contracts of affreightment, are to be paid in the same order as though they were liens arising from, and founded upon, the necessities of the ship. Nor is it intended to declare that any difference will be made between seamen's wages for the same season of navigation upon the lakes or between the claims of material-men who are concurrently giving credit to a ship, or vessel, in fitting her out for a specific voyage, or in preparing her for business at the commencement of a season of navigation; or who keep, concurrently, open accounts with a vessel during such season of navigation. Their claims may, perhaps, properly be considered as accruing at the same time, and be paid concurrently, without any departure from the general rule we have been considering. For most purposes, a season of navigation, upon the great lakes and their connecting waters, may be assimilated to a voyage, as that term is frequently used in the admiralty reports; and to found distinctions and give preferences upon short inland voyages, occupying from one to ten days each, would, in many cases of seamen's wages, under shipping articles, for the season of navigation, for continuous services, and of several material-men keeping open accounts against a vessel, be impracticable, if not absurd. All these questions are, very likely, sooner or later to be presented for consideration, and the exercise of the admiralty jurisdiction upon our great inland lakes, will require a system of rules and a series of decisions quite different from those of the courts of admiralty sitting upon the seaboard, but consistent with, and founded upon, those great principles of commercial and international policy which have hitherto controlled the decisions of the courts of admiralty of the United States, and of the other commercial countries of the civilized world. It would be unwise to attempt to anticipate and decide these questions, or others of a similar character hereafter to arise; and, judging from the experience of the past, they are likely soon enough to be brought into litigation, and to demand the most careful examination and the most deliberate consideration. The general principle before stated, and its practical application in a case like the present, may be taken as the settled law of this court; but the other questions which have been suggested in the course of this opinion, will be still open to argument, and subject to future consideration, whenever suitors shall deem it for their interest to present and argue them.