## THE BRIG E. A. BARNARD.*

### (Circuit Court, E. D. Pennsylvania.   June 4, 1880.)

ADMIRALTY—HOME PORT—RESIDENCE OF OWNER—FOREIGN REGISTRY. The port in which the owner of a vessel resides is her home port, although she has a foreign registry and sails under a foreign flag.

Per BUTLER, J.  As against one who had been misled by such representations, the owner would not be allowed to assert the contrary.

PRIORITY OF MARITIME OVER STATUTORY LIENS.—Maritime liens for supplies furnished to a vessel in a foreign port have priority over liens given by state statutes for repairs subsequently furnished in her home port.

DISTRIBUTION AMONG MARITIME LIEN CLAIMANTS—ORDER OF PAYMENT. *Semble* maritime liens of the same class or rank, upon a vessel, should (as a general rule) be paid out of the proceeds of the sale in the inverse order of their creation, without distinction between creditors of the same class, who are concurrently engaged in fitting the vessel for an intended voyage, and without respect to the dates of attachment.

*The Pathfinder*, 4 Weekly Notes, 528, not followed.

MARITIME LIENS—SERVICES OF WATCHMAN AND SHIP KEEPER.—The services of a watchman and ship keeper, rendered while the vessel is in port, do not create a maritime lien.

SAME—SERVICES OF STEVEDORE.—The services of a stevedore in loading a vessel in her home port do not create such lien.

SAME—AGREEMENT HYPOTHECATING VESSEL—WHEN NOT A BOTTOMRY BOND—ADVANCES TO VESSEL IN HOME PORT.—While a ship was in her home port her master, who was also her owner, borrowed money from parties abroad, and gave them a written agreement, providing that for such money they should have, " besides the responsibility of the owners, a lien on the ship and freight;" that the same were hypothecated to them, and that he would make them a remittance of the freight from Oporto, (the vessel's destination.) *Held*, that this instrument was not a bottomry bond.

*Held, further*, that the vessel being in her home port, the fact that the money was advanced to relieve her necessities do not give the advancers a lien as against other attaching creditors.

*Reported by Frank P. Prichard, Esq., of the Philadelphia Bar.

in Admiralty.

Exceptions to report of commissioner appointed to report as to the distribution of the proceeds of the sale of a vessel under admiralty process. The brig E. A. Barnard was registered at St. Andrews, New Brunswick, and sailed under the British flag, but was owned by her master, S. P. Willeby, who resided at Philadelphia. In the spring of 1879, upon the return of the vessel from a voyage to the Mediterranean, she had extensive repairs made to her at Philadelphia. In May, 1879, while she was still at Philadelphia, and loading for Oporto, a libel was filed against her by Thurlow & Sons, for supplies furnished in New York in July, 1878. Before any decree was obtained various libels of intervention were filed, as follows:

By Merchant & Co., and by various other parties, claiming liens for repairs furnished at Philadelphia, in the spring of 1879.

By Robert M. Wilson for wages as watchman and ship keeper at Philadelphia.

By Grace & Linderman for services as stevedores in loading the vessel, at Philadelphia.

By Baring Bros. & Co. for money advanced to the master under the following circumstances: Stetson & Co., the agents for the vessel at Philadelphia, had from time to time made disbursements on account of the vessel, many of which were for wages, and other objects that were maritime liens. Baring Bros. & Co. subsequently authorized the master to draw upon them for £430, for the vessel's disbursements at Philadelphia. The master drew for this sum in favor of Stetson & Co., who applied the money to their account for the previous advances. Accompanying the draft was the following instrument:

"PHILADELPHIA, May 16, 1879.

"*Messrs. Baring Brothers & Co., London.*

"GENTLEMEN: The British brig E. A. Barnard, under my command, will sail May 24th for Oporto, having on board a cargo of corn in bags. Freight amounting to £650. To

provide necessary funds to pay ship's disbursements here, for which ship and owners are liable, I have valued upon you this day for £430, at sixty days' sight, in favor of D. S. Stetson & Co., which please accept, for amount of which draft please insure the freight, loss payable to you, debiting premium, as well as amount of draft and your commissions, to account of said ship and owners; it being understood that for all such amounts you have, besides the responsibility of the owners, a lien on the ship and freight, and the same are hypothecated to you accordingly, with power to you to collect freight if you choose. I shall make you a remittance from Oporto of the whole amount of my freight, less expenses, to be placed to the credit of my ship-owners as soon as I realize from my freight. The recourse to owners, and lien on ship and freight, given as above to Baring Bros. & Co., after acceptance, are to operate in favor of the holder of the bill before acceptance.

"Respectfully, your obedient servant, S. P. WILLEBY.

"P. S. My vessel is owned as follows: S. P. Willeby."

The vessel was sold under a decree of the court, and the distribution of the proceeds referred to a commissioner, (Morton P. Henry, Esq.,) who reported that as between the lien for supplies furnished in New York in 1878, and the liens for repairs in Philadelphia in 1879, the latter should have priority, under the principle established by the authorities that the last service advanced for the vessel's necessities takes precedence, and that liens of the same class should therefore be paid in the inverse order of the dates of their creation, except as to claims of material men, who concurrently gave credit to the vessel in fitting her for a voyage, and who were, therefore, entitled to distribution *pro rata*. As between the various lien claimants for repairs made at Philadelphia in 1879, he reported that in accordance with the above principle they would be entitled to share *pro rata*, but that he felt himself bound by the decision in *The Pathfinder*, 4 Weekly Notes, 528, to award them priority in the order of the dates at which their respective libels were filed. The

commissioner refused to allow the claims of Robert M. Wilson and Grace & Linderman, on the ground that their services gave them no maritime lien.

With regard to the claim of Baring Bros. & Co., he reported that the instrument given to them was not a bottomry bond; that their advances, under the circumstances, gave them no maritime lien, and that by the application of their money to the previous advances made by Stetson & Co. they acquired no lien by subrogation as against the other attaching creditors.

To this report exceptions were filed by Thurlow & Sons, Merchant & Co., Wilson, Grace & Linderman, and Baring Bros. & Co.

*Edward F. Pugh* and *James B. Roney*, for Thurlow & Sons.

*Henry G. Ward* and *Henry Flanders*, for Merchant & Co.

*Edward F. Pugh*, for Robert M. Wilson.

*John A. Toomey*, for Grace & Linderman.

*Henry R. Edmunds*, for Baring Bros. & Co.

BUTLER, D. J. The exception filed by Grace & Linderman, stevedores, must be dismissed. I agree with the learned commissioner that such services do not create a lien. This view is, I believe, consistent with the uniform practice in this district, and with all the American cases, except that of *The George T. Kemp*, 2 Lowell, 477, in which the vessel was held to be *foreign*, and the decision put on that ground. As is said in *The A. R. Dunlap*, 1 Lowell, 350, the reason given for holding that such contracts are not maritime is not satisfactory, because the contracts of material men are not more so. But liens are allowed in such cases because the materials and supplies enable the vessel to make her voyage. The other reason assigned—that the cargo is a collateral matter, and not a part of the vessel's necessary equipment—is more to the purpose, though not entirely satisfactory, either, because the vessel cannot be used to advantage without a cargo. But, says Judge Lowell in this case: "It is important to adhere to the decisions, and I shall follow them in this respect, though I doubt their application to a foreign vessel." Subsequently, in *The George T. Kemp*, the same distinguished judge, as has

been seen, held the vessel there involved **to be foreign, and,** therefore, allowed the stevedore's claim.

While the circumstances of that case are very similar to those of the one before us, I cannot accept the conclusion that the vessel should be treated as foreign. She, clearly, is not. Her owner resides here, and here, therefore, is her home. That she has a foreign registry, and sails under a foreign flag, does not seem to be important. As against one who has been misled by such representations, the owner would not be allowed to assert the contrary. But here there has been no misleading. The residence of the owner in Philadelphia was well understood, and that the home of the vessel was therefore here, all persons dealing with him were bound to know. For necessary services and supplies furnished in foreign ports liens are allowed, on the presumption that credit is given the *vessel*, inasmuch as the owner, personally, has none there. When at home the presumption is reversed, and the credit treated as given to the owner personally. What difference can it make, therefore, that the owner registers his vessel abroad and sails under foreign colors? These facts do not affect the presumption on which alone the question of lien depends. But, aside from the reasonableness of this view, the point has been so decided in this court after full consideration. In *McCorker* v. *The Brig Thomas Walker,* the owners, residing in Philadelphia, had their vessel registered abroad, and sailed under foreign colors, to avoid danger from rebel cruisers during the late war, and a lien was claimed for services rendered here on the ground that she was *foreign.* The claim was disallowed by the district court, and, on appeal, by the circuit court also; Judge Grier filing a written opinion, in which, while expressing sympathy with the plaintiffs, he held that the foreign registration, and the use of a foreign flag were unimportant, in view of the owner's residence here, and the claimant's knowledge of this fact.

The exceptions filed by Baring Bros. & Co. must also be dismissed. The instrument they hold is not a bottomry bond. The informality it exhibits would be unimportant if it contained the essential elements of such a contract. But it does

not. The element of *marine risk* is wanting. The language, "I shall make you a remittance from Oporto," etc., (relied upon by the claimants, in this respect,) does not indicate that reimbursement is to *depend* upon the safe arrival of the vessel there. It bears no resemblance to the expression, "The amount to be paid in one month after the ship's arrival at any port of discharge in Great Britain," contained in the instrument involved in *The Nelson,* 1 Haggard, Ad. Rep. 169 ; as the court there said, "If the port was never reached, the time appointed for payment would never arrive." While the language of a bottomry bond should not leave the question of marine risk open to doubt, that of the instrument before me seems to be plainly inconsistent with the assumption of such risk. The stipulation for the *owner's personal obligation* cannot be reconciled with the idea that the vessel alone was looked to. Where the instrument is executed by the *master,* and a bottomry contract clearly appears to have been intended, a provision for such personal responsibility (being clearly beyond the master's authority) has been held void. This is reasonable, as well as just. But where the instrument is executed by the *owner,* the provision not being liable to this objection, its insertion bears with very great (though, possibly, not controlling) force on the question of marine risk.

The instrument held by Baring Bros. & Co. cannot, therefore, be treated as a bottomry bond. Nor can the transaction out of which it grew, separately considered, be held sufficient to support an ordinary maritime lien. Furnishing the means required to relieve a vessel's necessities, in a foreign port, would undoubtedly be sufficient. But here, as has been determined in passing upon the claim of the stevedore, the vessel was at home; and (looking at the transaction independently of the paper, as must be done in considering this aspect of the claim) the inference that it was credited (the only ground on which such a lien can rest) is inadmissible. These claimants cannot, therefore, receive anything, as against the lien creditors. If a balance remained for the owner, they might stand in his stead, as upon a mortgage, or other hypothecation not of a maritime nature.

8*

The second exception, filed by Merchant & Co., "that the commissioner erred in not paying *pro rata* all the claims for services rendered the vessel after arrival in Philadelphia on her last voyage, irrespective of the order of attachment," is more serious. The report in this respect is against the commissioner's judgment of the law, but in conformity to what he understands to have been the determination of this court in *The Pathfinder*, decided in 1877. Whether this understanding is correct I need not inquire. The case was peculiar in its facts, and upon the record is not readily understood. As no written opinion was filed, it cannot now be known, with certainty, what views controlled the court in entering the decree. According to the reported observations of the judge, made during the argument, his views of the law at that time were not such as the commissioner ascribes to him, though the decree subsequently entered seems to support the commissioner's conclusion, "that the case is authority for the rule that claims are to be satisfied out of the vessel's proceeds, according to the date of proceedings against it."

The commissioner does not, however, follow this rule thus broadly stated, but as he says: "Considering how such a rule would destroy the well-established principle of priority in maritime liens by which the material man or salvor, whose service or expenditure has preserved the vessel as a security for a pre-existing debt, has a priority, so that practically the last service advanced for the vessel's necessities takes precedence over a previous one, the commissioner believes that such was not the intention of the learned judge who decided the case, but that it was intended to apply the principles of *prior peteus* to the particular circumstances of that case." It is not clear, however, that the circumstances of the case justify this distinction; and the intelligent counsel of Thurlow & Son, (whose attachment was first in time,) earnestly contending that they do not, claims that his clients are entitled, under the authority of that case, to preference for supplies furnished on a *previous* voyage. The unreasonableness of the rule thus stated, and the great improbability that the learned and emi-

nent judge who decided the case would adopt it, are quite sufficient to justify serious doubt whether the case is correctly understood.

With the limitation put upon it by the commissioner, the rule is scarcely less unreasonable. Why should one of several individuals, who are concurrently crediting a vessel with supplies for an intended voyage, and entitled to liens, be preferred over the others because he happens to secure the first process? Why should the rights of parties thus be made to depend upon the result of a scramble? Such a rule would forbid all forbearance or indulgence of the vessel, and require each creditor to proceed to sue out an attachment at the earliest practicable moment. Support for the rule, however, in its broadest aspect, as well as the limited one adopted by the commissioner, may be found in a few cases; but, in my opinion, the decided weight of modern authority in this country is against it in either aspect. *The Paragon*, Ware's Rep. 330; *The America*, 16 Law Rep. 264; *The Fanny*, 2 Lowell's Rep. 508, each involved the question, and in each it was held, after a careful examination of the authorities, that liens of the same class or rank, upon a vessel, should (as a general rule) be paid out of the proceeds of sale in the inverse order of their creation, without distinction between creditors of the same class, who are concurrently engaged in fitting the vessel for an intended voyage, and without respect to the dates of attachment. In *The America* importance is attributed to the *decree* in this respect; but it is said the court will control the decree, so as to avoid an improper preference. In *The Fanny*, however, decided more recently, Judge Lowell says: "One who obtains a decree obtains no priority thereby over others whose liens are, of themselves, of equal degree, where all the claims are pending together If there has been a break, such as a voyage, those who have supplied the last voyage have a preference over those who furnished an earlier outfit." While thus repudiating the suggested advantage of a decree, he refers approvingly to the careful and elaborate opinion of Judge Hall as a correct exposition of the rules

and principles prevailing in this country respecting maritime liens.

In view of the high authority of these cases, and the justice of the principles they promulgate, I think *The Pathfinder* (granting that it is understood) should be treated as a mistake, and be disregarded. I feel the less hesitation in adopting this conclusion, in consequence of the presence of Circuit Judge McKennan at the argument, (who kindly consented to sit with me, that the benefit of his judgment might be had without an appeal,) and his concurrence in this opinion.

Had we here only the Philadelphia creditors, the decision of this question would have been unnecessary; as their liens depend on the *local statute*, they can claim only what it gives. And it expressly provides that if the proceeds of the vessel "shall not be sufficient to satisfy all the liens, the same shall be paid *pro rata.*" The federal courts, in enforcing such liens, must necessarily look to the statutes out of which they grow to ascertain the rights of claimants. The claim of Thurlow & Son, however, for supplies furnished in a foreign port, renders a decision of the question necessary. These gentlemen, as appears by what has been already said, obtain no advantage by means of their early attachment; and in consequence of the supplies having been furnished for a previous voyage, their lien is inferior to that of the Philadelphia creditors. They cannot, therefore, participate with them in the distribution.

We agree with the commissioner respecting the claim of Mr. Wilson, and disallow it for the reasons he states.

All the exceptions are dismissed, saving the second, filed on behalf of Clark Merchant, which is sustained. The report of the commissioner must be reformed accordingly.

JUNE 3, 1880. While engaged in writing the foregoing opinion, I was impressed with a belief that the *statutory* liens should be treated as subordinate to the maritime lien of Thurlow & Son, although the latter is on account of a prior voyage; but as the point was not made before the commissioner nor

on the argument, I was indisposed to raise it. On a suggestion to counsel since, however, it has been carefully examined and discussed, and is ascertained to be well founded. The maritime law of the country is a part of the federal system, administered alone by the federal courts, and a concession of right to interfere with it in any respect by the states, is difficult to reconcile with reason. That they may interfere, however, to some extent, as by creating liens for supplies furnished, and repairs made in home ports, is well settled, though the fact is rarely referred to by the courts without an expression of regret that it is so. *The Gen. Smith*, 4 Wheat. 438; *Peyroux* v. *Howard*, 7 Peters, 324; *Orleans* v. *Phebus*, 11 Peters, 175; *The St. Lawrence*, 1 Black, 522; *The Lattawanna*, 21 Wall. 580. No further interference, however, has been permitted, and no instance is found in which such statutory liens have been allowed to displace or supersede liens created by the maritime law. They are but *quasi* maritime, have uniformly been so considered by the courts, and are recognized and allowed only after all maritime liens proper are paid. The creditors holding them are citizens of the state, and it is permitted to direct the order in which their claims shall be paid. To allow state legislation a greater effect would be to concede the right to alter and change the maritime law of the nation in a most material respect. The right so to change and alter has been most emphatically denied, (as in principle it must be,) whenever the subject has been mentioned. *The Lattawanna*, 21 Wall. 580; *The St. Lawrence*, 1 Black, 522; and other cases therein cited.

What alteration could be more material than that of divesting, superseding, or in any respect changing the order of satisfying, liens? While the precise question under consideration here has rarely been raised, under circumstances requiring decision, it has in a few instances; and the cases in which the general subject has been incidentally remarked upon by the judges are numerous. Every decision, and every expression, found, is in harmony with the view herein stated. *The St. Joseph*, Brown's Adm. R. 203; *The Harrison*, 2 Abb. U. S. 74; *The John Richards*, 1 Biss.

v.2,no.8—46

106; *The N. W. Thomas,* 1 Biss. 219; *The Royal Saxon,* 2 Am. L. Reg. 324; *The Chusan,* 2 Story, 455; 1 Sprague, 39; *Smith* v. *Steamer Eastern,* 1 Curtis, 259; *The Hiawatha,* 5 Sawyer, R. 160; *Francis* v. *The Harrison,* 1 Sawyer, R. 353; *Hill & Conn* v. *The Golden Gate,* 6 Am. L. Reg. (O. S.) 273; *The Kate Hinchman,* 6 Biss. 367; *The Grace Greenwood,* 2 Biss. 131.

The lien of Thurlow & Son was not lost, by lapse of time, or other cause; *The Atlantic,* Crabbe, 440; *The Rebecca,* 1 Ware, 188; *The Prospect,* 2 Blatch. C. C. 527; *The Young Mechanic,* 2 Curtis, 404; *The Chusan,* 2 Story, 468.

The claim of Thurlow & Son must, therefore, be paid in advance of the statutory liens.