WEAVER (NEWTON v.).  See Case No. 10,-193.

## Case No. 17,310.

### WEAVER v. The S. G. OWENS.

[1 Wall. Jr. 359.][1]

Circuit Court, E. D. Pennsylvania.  Nov. 13, 1849.[2]

FOREIGN AND DOMESTICK VESSEL—JURISDICTION—LIEN—SHIP CHANDLERY.

1. For the purposes of enforcing a lien given by a state law against domestick vessels, and where the national character is not in dispute; the person rightfully in possession, navigating the vessel for his own use and profit, by officers and mariners appointed and employed by himself, will be considered the owner, whether he be lessee, mortgagee, or parol vendee, notwithstanding some other person may be the registered owner and have the legal title or general ownership in himself.

[Cited in The Island City, Case No. 7,109; Reeder v. The George's Creek, Id. 11,654; The John Farron, Id. 7,341.]

[Cited in Metcalf v. Hunnewell, 1 Gray, 298; Donnell v. The Starlight, 103 Mass. 231.]

2. The district court of the United States has power to enforce the lien on domestick vessels under the Pennsylvania statute of June 13th, 1836, which, though providing, almost entirely, for a process of enforcement through the state courts, does yet not exclude, but in one section, contemplates the action of the federal court.

3. "Ship chandlery," is a term of extensive import, and includes every thing necessary to furnish and equip a vessel, so as to render her seaworthy for the intended voyage. Accordingly not only stores, stoves, hardware and crockery, were held to be within the term, but muskets and other arms also;—the voyage being round Cape Horn to California, in the course of which voyage, arms are sometimes carried for safety.

[4. Cited in The Witch Queen, Case No. 17,-916, to the point that the question whether a vessel is to be regarded as foreign or domestic depends upon the residence of her owner, and not on the place of her registry or enrollment.]

[Appeal from the district court of the United States for the Eastern district of Pennsylvania.]

The ship S. G. Owens was registered in the district of Maryland, as the property of Mr. Buck and others, her owners, resident in Balti-

---

[1] [Reported by John William Wallace, Esq.]
[2] [Affirming Case No. 13,634.]

more. On the 21st of February 1848, being then at Philadelphia, she was made the subject of an agreement by the owners, who "do by these presents sell said named ship to H. & S. Townsend." Part of the money was to be paid on the execution of the agreement, and the balance on certain days thereafter. The new purchasers, the Townsends, agreed "to forfeit all claim of ownership on the said vessel," provided they fail to perform their portion of the contract; and the other parties agree that when the money is all paid, they will have the ship "legally transferred" to the Townsends. The registry was not changed. This agreement was made and executed at Philadelphia, where the Townsends were. But they were not residents there in the ordinary sense of that word. They seemed to be mere adventurers who came there for the occasion, one of them intending to take passage in the ship for California, which was to be its first destination. They took possession of the vessel, to fit and navigate her for their own use and profit, and appointed her officers and seamen. They then proceeded to fit her out on an expensive scale for two hundred and fifty passengers, and laid in stores for a two years' voyage. The contracts with the material men and others were not made by the Townsends in person. The captain, sometimes alone, sometimes in company with the father of one of the partners, who acted as the agent of the concern, gave orders, and they were executed in all cases on the credit of "the vessel and her owners." The Townsends paid the money required to be paid on the execution of the agreement, but could pay no more; and on the 25th April transferred their contract and the outfits of the vessel to Evans of Philadelphia, who paid the purchase money on the vessel, and had her registered anew, in his own name. Between the date of the agreement with the Townsends and the date of Evans' purchase, the libellants furnished certain matters to the ship, for which this libel was filed. [Case No. 13,634.] It is requisite here to state that an act of the Pennsylvania legislature declares (Act June 13th, 1836, § 1) that vessels of all kinds, "built, repaired or fitted within this commonwealth, shall be subject to a lien for all debts contracted by the masters or owners thereof, for work done or materials found or provided in the building, repairing, fitting, furnishing or equipping of the same." But it confines by express words (Act June 13th, 1836, § 3) this lien, to "carpenters, blacksmiths, mast-makers, boat-builders, block-makers, rope-makers, sail-makers, riggers, joiners, carvers, plumbers, painters, ship-chandlers, coppersmiths, brass-founders, coopers, venders of sail-cloth and lumber-merchants." Any one of these persons (section 4) "may file a libel in the office of the district court or court of common pleas of the proper county, wherein the cause of action shall arise, or in any county where the said ship may be found." On the filing of this libel (section 8), writs, whose forms are prescribed by the act, both for mesne and final process, and issuing

from a "county," are given by "the commonwealth of Pennsylvania to the sheriff of said county." If there are more libels than one, there may be a consolidation of suits. (Section 9). Questions of fact are to be "tried by a jury of the county." (Section 13.) But the act, forbidding any attachment to issue against a vessel already sold or held, by the district court of the United States (section 9), provides, nevertheless, that if the payment of her debts prior to the time of sale, shall be decreed by the said court, "the lien shall continue until the payment thereof shall be enforced by the process of such court." A complete system of enforcing the lien is provided by the act in the state court, and this is the only allusion to the courts of the United States in the act.

In this state of facts, the libellants, trading as "ship chandlers," had filed claims for ropes, ship tools, sea stores, provisions, glass and Britania ware, china, crockery, pencils, and varieties of hardware, including cooking stoves, cooking utensils, muskets and other arms, furnished, as has been already said after the time when the Townsends became interested in the vessel, and before the transfer to Evans. The testimony of several shopkeepers and nautical men proved that, in their understanding, ship chandlery was a word of very extensive import, including every thing that could be wanted, on, in or about a ship's service. And in a printed advertisement of the plaintiff's, for the sale "of ship chandlery," were enumerated near two hundred articles, including quills, ink and ink-stands, letter-paper, table-spoons, tea-spoons, knives, forks and cork-screws, besides a great number of items of hardware, and a general announcement of "crockery" and "tin-ware." It appeared also that guns were taken for defence upon a California voyage, round Cape Horn.

The following questions accordingly arose in the court, where the case came on appeal: I. Whether, as regards the port of Philadelphia, the ship was a foreign or domestick one. II. Whether if a domestick one, the district court of the United States could enforce the lien given by the Pennsylvania statute against domestick ships. III. If it could, whether such articles as those furnished in this case, were within the terms "ship chandlery," and such accordingly as "ship chandlers" could claim a lien for.

G. M. Wharton and Mr. Kennedy, for Evans.

There is no lien under the general maritime law. For all the purposes of lien the vessel, by the agreement of February 21st, had passed to the Townsends. The language is, we "do sell." These persons resided in Philadelphia, so far as they resided any where. The vessel was in her home port and a domestick vessel; a case where no lien attaches for supplies. The General Smith, 4 Wheat. [17 U. S.] 438.

II. The Pennsylvania statute does not give a lien which the courts of the United States can enforce. That act designed to create and en-

force in courts of the state, a lien which neither existed nor could be enforced elsewhere: and it simply gives admiralty process to the state courts, in certain cases where none existed in the admiralty itself. The admiralty is not once mentioned in the act, except to prevent a conflict with the state jurisdiction. The process prescribed by the act, testes from a "county," and is from a state to a "sheriff." The act provides for consolidation of suits and trial by jury; proceedings unknown to the admiralty. It is a state affair in its very source; and the act itself, as it ought to do, and as it had the power alone to do, enforces its protection through courts where it had power to enforce them, if any where, and not in this court where it has no power at all. The provision in the ninth section refers to the case of foreign vessels against which the act gives a lien as well as against domestick ones, which may be held by the United States process in virtue of general principles.

But in the last place, the act never meant to give a lien for such articles as are embraced by this claim. The court has decided that it gives no lien to stevedores. M'Dermot v. The S. G. Owens [Case No. 8,748]. It embraces no more, those persons who supply sea stores, provisions, or articles for passengers' use merely. The context of the section, and the class of persons embraced by it, shew that it meant to protect those persons alone who furnish articles used in or about the vessel itself. Stores are used by the passengers.

Donegan & Barnes, for libellants.

There is a lien under the general admiralty law. The agreement with the Townsends was not a sale. The registry remained unchanged. The ship was never "legally transferred;" and the Townsends, having failed to pay the balance of the purchase money, "forfeited all claim of ownership." The owner of the vessel was therefore always at Baltimore: that was her home port: and it is a foreign port so far as Philadelphia is concerned.

II. The admiralty may enforce the state lien, if the ship is not foreign. The ninth section of the state act, itself, declares that if the admiralty shall hold or have sold the vessel, no process shall issue from the state for the lien which the act gives: and provides that if payment of her debts prior to time of sale be decreed, the lien shall continue until payment be enforced by process of such court: i. e. by the court of admiralty. The act could give no power to the admiralty to enforce a lien created by the state. It is enough that it creates the lien. It assumes, and rightly, that the admiralty in virtue of its own powers, can enforce a lien already existing. This matter has been decided by the supreme court. Peyroux v. Howard, 7 Pet. [32 U. S.] 324, 341. It provides a state process, where the admiralty don't proceed, only because it could provide no other.

The act does not mean to give a lien for such articles alone as are attached to the ship's hull. It meant to give to a creditor in a domestick

port, the same rights that one in a foreign port would have. An act of Pennsylvania relating to liens on houses, confines its lien to "work done or materials furnished for or about the erection or construction" of the house. But the lien here is for work done or materials found or provided in the building, repairing, fitting, furnishing or equipping the ship. It is, moreover, a remedial act and to be construed in advancement of the rights of the "ship chandler," whom it provides for. The evidence is that, in nautical and common parlance, every thing used in or about the ship's service is included by the term ship chandlery.

GRIER, Circuit Justice. In reference to the question, whether a court of admiralty has jurisdiction to enforce a lien on a vessel given by a state law. I need only say that the supreme court of the United States has decided that such a lien may be enforced, and that the point is not open. Peyroux v. Howard, 11 Pet. [36 U. S.] 324, 341. The eighth section of the present act I may add, however, contemplates that this lien may be enforced in a court of admiralty as well as in a state court.

The next question is, whether this ship is foreign or domestick, as regards the port of Philadelphia? It is admitted that a vessel owned in a port of any other state, which puts into the port of Philadelphia, would be liable, under the general maritime law of the United States, for repairs made or necessaries supplied, in order to enable her to prosecute her voyage. She is considered for this purpose as a foreign vessel, when in the port of a state where her owner does not reside, notwithstanding her national character as an American vessel remains the same.

The enrolment of a vessel is for the purpose of establishing her national character and to give her the privileges of an American vessel. In a question of ownership inter partes, it is but prima facie evidence of title in the person in whose name she is registered, and liable to be rebutted by proof of actual ownership in another, whether temporary or absolute, as lessee or vendee. It is not necessary to enquire whether by the maritime law the title to a ship can pass by parol. I have no doubt but that by the law of Pennsylvania, the title would pass by actual sale and delivery as in the case of other personal chattels, without any written bill of sale. The formal bill of sale reciting the registry may be necessary for the purpose of enrolment, but as between the parties, and those who deal with the vessel, and where the national character is not in dispute, the person rightfully in possession navigating the vessel for his own use and profit, by officers and mariners appointed and employed by himself, will be considered the special owner, whether he be lessee, mortgagee or parol vendee, notwithstanding some other person may be the registered owner, and have the, so called, legal title, or general ownership in himself. If the Townsends had hired this vessel for a year, or for a single voyage from Philadelphia to California

and back again, although Mr. Buck in Baltimore, might be the lessor, and registered and general owner of the vessel, with the legal title, yet the Townsends and not Buck, would be considered as owners, as between themselves and all persons dealing with the Townsends, for supplies furnished to the vessel. Neither they nor the captain, their officer and agent, could bind Mr. Buck the registered owner, by any contract made for such supplies. A vessel hired or leased by a merchant in Philadelphia from a merchant in Baltimore, for the purposes of a voyage from Philadelphia to California and back again, and furnished and equipped by the lessee in this port, could not be considered as a foreign vessel by those who dealt with the lessee in this place, notwithstanding the legal title and general ownership of the Baltimore lessor. In such case this would be considered as the home port of the vessel.

We have in this case not a mere agreement to sell at a future time, but a sale in verba depresenti—(we "do by these presents sell said named vessel)—an actual delivery to the vendee, and a large sum of money paid to the vendor. It is true there is an attempt to give a defeasible title, on condition subsequent. The vendor has endeavoured in this way to retain a lien in the nature of a mortgage to secure the balance of the purchase money;—whether successfully or not we need not enquire.

The Townsends having thus obtained rightful possession of the vessel, with a title (defeasible perhaps on condition subsequent, or as mortgagor) whether legal or equitable it matters not,—proceed to equip her for a voyage to carry passengers from this port to California. They appoint the captain, hire mariners, contract with passengers; and the libellants treat with them as owners, and supply materials to furnish and equip the vessel for her intended voyage. No one supposed he was dealing with Buck in Baltimore as owner, or that the Townsends or the captain appointed by them, could bind Buck by any contract. Buck is guilty of no fraud to the injury of libellants. They treated with the Townsends as owners, who for the time at least, resided here. As to the libellants and all who dealt with them, the ship was a domestick vessel, and this her home port. No seizure of the vessel by Buck, under his supposed legal title as mortgagee, would defeat or supersede any liens obtained by the libellants or others against the ship, while in the possession of the Townsends. If the libellants treated with them as the legal owners, they cannot complain, if every remedy against the vessel be allowed them as if such were the actual fact.

Under no view of the facts of this case, therefore, can this vessel be treated as foreign.

Being a domestick vessel, then, have the libellants any lien under the act of Pennsylvania, which enumerates ship chandlers among the persons entitled to such protection?

Although the counsel for the owners insist that many of the articles provided by the libellants, as groceries, crockery-ware, cooking stoves and cooking utensils, muskets and guns, are not ship chandlery; yet they furnish us with no criterion to test the fact as to what articles are, and what are not within the definition. A chandler is defined by lexicographers, as "an artisan whose trade is making candles, or as one who sells candles." This was the meaning of the term as originally used: but as sellers of candles in course of time, extended their business and assortments so as to include groceries of many kinds, the meaning of the term became more expanded; and we find it used as a synonime for "dealer." Thus a dealer in corn is called in England a corn chandler.

A "ship chandler" is usually defined, as "one who deals in cordage, canvass and other furniture of ships." Now it has been decided (Brough v. Whitmore, 4 Term R. 206) that provisions for the use of the crew are included in the term "furniture" of a ship. In fact, "furniture of ships," ex vi termini, includes every thing with which a ship requires to be furnished or equipped to make her seaworthy. The testimony of the merchants and nautical men who have been examined on this subject, leaves no doubt that the term is indefinite, and includes all articles furnished by ship chandlers, which are almost innumerable. Persons fitting out vessels apply to these persons for every thing necessary for the outfit, from a needle to an anchor, including groceries, liquors and all ship stores; in a word every thing necessary to furnish and equip a vessel, so as to render her seaworthy for the intended voyage. The materials necessary to fit, furnish and equip a vessel, must depend on the nature of the voyage. A steam packet and a whaling vessel, would require very different furniture and equipments, both in character and amount. A vessel bound for California with two hundred and fifty passengers, would not be seaworthy for such a long voyage, without immense stores of provisions of all sorts. It is moreover found necessary for vessels going round Cape Horn, to carry arms for the purpose of defence.

The law gives a lien to a ship chandler, and does not define or limit the articles for which he is to have this lien, further than that they shall be used in "fitting, furnishing and equipping the vessel;" and every debt contracted by the master or owner of a vessel, with a ship chandler for articles or materials used for any one of those purposes, is within the letter as well as the spirit of the act; it matters not by what other names the same article or material may be designated. The master and owners of this ship have also given their own definition of ship chandlery, by ordering from the libellants, who as "ship chandlers," advertised these things, to fit and equip the ship with them for the voyage. Decree of the district court affirmed with costs.