## The Samuel Marshall.

## Pittmans et al. v. The Samuel Marshall.

*(District Court, E. D. Michigan. February 5, 1892.)*

1. MARITIME LIENS—SUPPLIES—RESIDENT AND NON-RESIDENT OWNERS.

Under the general maritime law, no lien exists for supplies furnished at the port of a state of which the ship-owner is a resident, and *quære*, whether the rule is not the same where part of the owners reside in the state in which is situated such port, and others reside in foreign states, the facts being known to the party furnishing the vessel.

2. SAME—CHARTERED VESSEL—RESIDENT CHARTERER—PRESUMPTION.

If a vessel, at the time supplies are furnished her, is in the use, possession, and control of others than the owner, which fact is or ought to have been known to a party furnishing supplies, and the person so having the possession of the vessel resides at the port where the supplies are furnished, there exists the same presumption that credit was not given to the vessel as in cases where the owner resides at such port.

3. SAME—STATUTORY LIENS—HOW ENFORCED IN ADMIRALTY.

It is because the contract for supplies is maritime that an admiralty court has and exercises its jurisdiction in enforcing the lien given by the law of a state for its security, and admiralty courts construe and enforce such lien in harmony with their general principles, and under the same limitations and qualifications as pertain to maritime liens in general.

4. SAME—STATUTORY LIENS—NECESSARY PROOF.

A material-man, seeking to enforce against a vessel a lien for supplies given by the statute of a state, must establish by proof, as in the case of one furnishing supplies to a foreign vessel, that credit was given to the ship.

5. SAME—CHARTERED VESSEL—ENFORCEMENT OF LIEN—EQUITY.

When the circumstances denote that the owner of a vessel is not the party for whose interests the supplies are furnished, and would not be at fault if they were not paid for, it would be inequitable that a merchant should have the right to give credit to another, and assert a lien therefor, contrary to the stipulations and interests of the owner.

6. SAME—STATEMENT OF CASE.

The owner of a steam-ship having chartered her to a company which was a resident of the same town as libelant, the charter expressly stipulating against the creation of any liens on the vessel, and the circumstances indicating that libelant supplied coal to the vessel knowing that she was under charter, and on the credit of the charterers, who subsequently failed, *held*, that no lien attached to the vessel, either under the general maritime law or the statute law of Michigan.

7. PRACTICE—AMENDING LIBEL.

*Held*, that the libel in this case, which claimed a lien under the general maritime law, might be amended so as to assert a lien under the law of the state.

In Admiralty. Suit to recover the price of coal furnished the steamship Samuel Marshall.

*Bowen, Douglass & Whiting*, for libelants.

*Shaw & Wright*, for claimants.

Before SEVERENS, District Judge.

SEVERENS, District Judge. The libel was filed in this case for the purpose of enforcing a lien upon the steamer, the respondent in the case, for coal supplied by Pittmans & Dean for the steamer's use, in September and on the 1st day of October, 1890. The libelants were coal mer-

chants at Detroit, having a dock by the river, at which vessels navigating the stream and the waters it connects called for fuel supplies as occasion required. Their principal office was not located near the dock, but further up, in a more central part of the business portion of the city. They employed a foreman, who had an office at the dock, whose duty it was to attend to the delivery of coal to steam-vessels, when they would call for it, and to receive payment therefor, if the sale was for cash, or otherwise to keep a memorandum of the amount, and of the name of the vessel supplied; to take a certificate from the master of such amount received by him; and to also obtain from him the name and address of the party to whom the bills should be sent for payment,—all of which he reported to the main office. When the coal was furnished on credit, it was the custom of the firm to render by letter addressed to the proper party, as indicated by the foreman's report, monthly statements, showing the amount delivered and charged to the vessel, together with the captain's certificates confirmatory thereof. In a few days thereafter it was customary to send a collector to receive payment of bills from parties having a place of business at Detroit. This method of doing business was habitual with the libelants. No inquiry was made at the time of furnishing coal as to owners' credit or place of residence, or whether the vessel was being run by owners or charterers, or on whose account, except as above stated. The coal was charged upon their books against the vessel, apparently upon the assumption that, if the parties to whom bills were sent did not pay, they could assert a lien on the vessel. At the time when the coal in question was supplied, and during the whole season of navigation that year, the Samuel Marshall was owned by several parties, one of whom resided at Detroit, and the others at Buffalo and other places in the state of New York. The vessel was enrolled at Buffalo, and that was duly indicated as the port to which it belonged, by the imprint on the stern of the vessel, pursuant to the requirements of the statute. But during that whole season the vessel was under charter-party to J. E. Potts, for the use of the J. E. Potts Salt & Lumber Company, a Detroit firm, doing a very extensive business, involving the transportation of lumber, ore, coal, grain, etc., from Chicago and Duluth to Buffalo and return. Among other vessels chartered for this purpose was the Marshall. The charter was of the bare ship, and by it the charterers undertook to pay the entire charges of the vessel, and the running thereof, including the wages of the captain and crew, who were also to be employed by the charterers, except that the owners reserved the right to participate in naming the captain, a stipulation usual in such contracts, and adopted for the better protection of the interests of the owners in the vessel; and there was an express stipulation against the creation of any liens against the vessel. Coal had been furnished to the Marshall throughout the entire season of 1890 by the libelants in accordance with the usual course of their business as above stated, and the monthly supplies were all paid for by the J. E. Potts Salt & Lumber Company, down to the month of September. In the early part of the season the master of the Marshall,

on taking in some coal, informed the foreman of the libelants, at the dock, of the residence of the owners, and of her being under charter to the Potts Salt & Lumber Company, and gave the name and address of that concern as the party to whom bills should be presented for payment. The office of that company was, and had been for some years, within the distance of a block from that of the libelants. The statements were made out and sent to that company monthly, in the way already mentioned, and were paid by them to the collector. On calling for the amount of the July bills the company asked for time, and, after conferring with his principals, the collector took the company's acceptance for 60 days, and receipted the bills as so paid, and the acceptance was duly paid. Bills for the coal included in the present claim, amounting to $1,466, were sent in the same way to the Salt & Lumber Company, and on the ——— day of November the collector called for payment. The bills included also some coal supplied to another steamer employed by that company. Time being again asked by the company, the collector received their acceptance, due in 90 days, and receipted the bills as before. He did not, on this occasion, refer to his principals about it, but he took the acceptances to their place of business, and they were deposited in their cash-box. One of them was afterwards deposited in bank for collection. The Salt & Lumber Company failed on November 24, 1890. It had doubtless been insolvent for a time further back than the 1st of September, but this was not known to the libelants, who, so far as appears, had no reason to distrust their credit. The libel counts upon the general maritime law as the foundation of the lien asserted, no reference being made to the statute of the state, which gives a lien for supplies to such vessels, whether furnished to them in the foreign or home port.

It is necessary, therefore, to determine whether, in the circumstances stated, the libelants have, by the principles of the general maritime law, a lien upon the vessel for the coal thus furnished, and I am of opinion they have not. It is clearly proven that the vessel was at the time not in the employment of the owners, but was manned, controlled, and navigated by the Salt & Lumber Company, under a charter giving them entire possession of the boat, and imposing upon them the obligation to pay all charges incurred by the steamer while in their service. The charterers resided and were doing business at the port of supply. It cannot be denied that if the owners resided at Buffalo where the vessel was enrolled, or if the libelants had good reason to believe so, after due inquiry, and they delivered the coal upon the credit of the steamer, a lien would inure to them for the price; and it is equally true that if the owners resided at Detroit, and the libelants knew, or ought to have known, that this was so, no lien, under the general maritime law, would have arisen, the rule being that, in the absence of a specific agreement, no lien exists for supplies furnished at the ports of a state whereof the owner is resident,—it being presumed that they were furnished upon the credit of the owner. *The General Smith*, 4 Wheat. 443; *The Lottawanna*, 21 Wall. 579. It has been held in some cases that where part

of the owners reside in the state of the port where the supplies are furnished, and the others in a foreign state, and the facts are known by the party furnishing the vessel, the same rule would apply as last stated. *The Rapid Transit*, 11 Fed. Rep. 322, 328–330; *Stephenson* v. *The Francis*, 21 Fed. Rep. 715–717; and in *The Indiana*, Crabbe, 479. I do not decide what the rule is in such cases here, choosing to place my decision on other grounds.

For the purpose of applying the general rules just referred to, regard is had, not so much to the question as to who is the owner of the legal title, as to that of possession and use of the vessel at the time when the supplies are furnished. If the vessel is then in the use, possession, and control of others than the owner, a presumption arises that such others are liable to pay the charges incident to the employment; and if the party furnishing supplies knew, or should have known, the facts in regard to the use and control of the vessel, there is the same reason for the presumption against credit being given to the vessel, when the charterer or other person standing in a similar relation to the vessel resides at the port of supply, as in cases when the owner operating the vessel on his own account resides at such port, " and when there is the same reason there should be the same law." And this doctrine is supported by decisions in well-considered cases. *The Golden Gate*, 1 Newb. Adm. 308, 5 Amer. Law Reg. 142; *Beinecke* v. *The Secret*, 3 Fed. Rep. 665; *The Norman*, 6 Fed. Rep. 406; *The Secret*, 15 Fed. Rep. 480; *Stephenson* v. *The Francis*, 21 Fed. Rep. 715.

In regard to the question of fact involved as to whether the libelants knew that the Salt & Lumber Company were using and controlling the Marshall under a charter-party or some similar agreement, my impressions from the proof are strong that they must have known it, or from mere carelessness and indifference neglected to inform themselves of facts which were patent to inquiry. It is claimed that the notice of the fact that the vessel was under charter, given by the master to the foreman on the dock, was actual notice. On the other hand, the libelants insist that the foreman was not of such grade of authority as to constitute him their agent for the purpose of receiving such notice. But I do not decide as to this, my opinion being that they knew, or that it should be imputed to them that they knew, the fact which the visible signs plainly indicated. The libelants cannot, therefore, succeed upon the ground of a lien under the general maritime law.

But it is suggested that the libel be amended so as to assert a lien under the law of the state. This is opposed by the claimants for the reason, as alleged, that it makes a wholly different case. In my opinion, the case is one where, within the rules and practice of the court in regard to amendments, it may properly be allowed, if that, indeed, is necessary, as seems to be supposed. *Dupont* v. *Vance*, 19 How. 162; *The Mary Ann*, 8 Wheat. 380; *Warren* v. *Moody*, 9 Fed. Rep. 673; *The Morning Star*, 14 Fed. Rep. 866. The change is only with regard to the source of the lien, in point of law, asserted by the libelants. The

proof would not be different, and there can be no surprise. If the proctor for the libelants considers such an amendment necessary, the libel may be amended. This will enable the court to decide the case upon its merits, according to the law deemed applicable thereto.

It was claimed at the hearing that the state statute (2 How. Ann. St. § 8236) was of general application, and gave a lien in all cases when supplies, etc., were furnished, and the course of business of the libelants with its customers seems to have been pursued with such an understanding of the law. They supposed they could finally resort to the vessel, if the parties to whom they looked for payment should fail to pay. But, in my opinion, this position is untenable. The statute must be construed with reference to the general principles relating to the subject. It declares that vessels shall be subject to a lien for all debts contracted by the owner, part owner, master, clerk, agent, or steward on account of supplies furnished for the use of the vessel. By the ordinary rule of construction, the words following "the owner" should be taken to be such persons as stand in relation to the owner, and presumably having his authority to incur the debt contracted, and not the subordinates and agents of others. It has been generally understood that the principal purpose of the local statutes of the states of a like character was to extend to those supplying domestic ships the same privilege which is accorded to those supplying foreign ships. The statute in terms extends to all cases alike, whether the vessel is foreign, in which case the lien exists by the admiralty law, or whether the vessel is domestic. Was it intended by the statute to supplant the admiralty law, and supply a system of its own? That cannot be supposed. Such statutes have never been thought to have any such effect. The jurisdiction of the admiralty courts has been extended over the liens created by those statutes in favor of those furnishing supplies at the home port, because the contracts upon which they were furnished were maritime in their nature, and in exercising such jurisdiction the courts have applied the general principle applicable to maritime cases. They take cognizance of those statutes only to the extent of recognizing the creation of a lien thereby. They ignore altogether the method prescribed for its enforcement. They adopt their own procedure, and enforce the lien, together with other rights brought under judgment in the case, according to the rules and doctrines peculiar to their own jurisdiction. They do not by their decrees administer the lien according to the statute. No reference is made to it in the award or distribution or other disposition by judgment. As was said by Mr. Justice MATTHEWS in a leading case in this circuit, (*The Guiding Star,* 18 Fed. Rep. 263:) "In enforcing the statutory lien in admiralty cases, the admiralty courts do not adopt the statute itself, or the construction placed upon it by the courts of common law or equity, where they apply it." It is because the contract for supplies is maritime that the court has and exercises its jurisdiction in enforcing the lien given for its security. *The Lottawanna,* 21 Wall. 558, 580. The court does

not have jurisdiction of it as an independent thing; that is to say, disassociated from the contract. The lien is an incident to the debt, and is inseparably connected with it, reflecting its qualities.

This being so, will the admiralty courts treat the lien thus recognized as superior and privileged over others? Should it have intrinsic authority, without regard to the facts upon which others are allowed to prevail? Will the lien be given effect contrary to the reason and practice of the court, as exhibited in the rules and doctrines its long experience has evolved? Or does the court adopt the lien, clothing it with the same attributes, and holding it under the same limitations, as are applied to other maritime liens? It would seem that it might lead to incongruous results and serious conflict and difficulty, if the latter be not regarded as the sound rule. It is only in thus dealing with such liens that the priorities given by the maritime law in the admiralty courts can be upheld. It was declared by HOFFMAN, J., in his opinion in *The Columbus*, 5 Sawy. 487, that there was no reason for thinking that such statutes were intended to do more than to give domestic material-men the same protection which the maritime law afforded to foreign material-men, or for thinking that it was intended to withdraw demands of the former from the operation of the general rules and principles by which maritime liens are governed. This view finds support in the opinion of Mr. Justice CURTIS in *The Young Mechanic*, 2 Curt. 404; and this leads to pretty nearly the same result as that which I deduce from the general principle and course of decision in the admiralty courts in enforcing maritime liens, namely, that those courts will for themselves construe the statutory lien, and enforce it in harmony with their general principles, and under like limitations and qualifications as pertain to maritime liens in general. But there are other cases, one or more, in which different views would seem to have been adopted, and a more enlarged effect given to the local statute. I have not overlooked the reasons given for the different result, but my own views remain as stated, after full consideration of the subject.

If the propositions already advanced are correct, it would follow that the libelants must establish by proof that, as in the case of one furnishing such supplies to a foreign vessel, they gave credit to the ship. *The Lottawanna*, 21 Wall. 581. My opinion is that in point of fact they did not, and that the credit was given to the Potts Salt & Lumber Company, with the supposition that, by force of the transaction, the libelants would have a lien upon the vessel. This is quite a different thing from giving credit to the vessel. That the goods were charged on their books to the steamer is of little significance. This was their habitual method of business in their office. A similar feature existed, and was commented upon in *Beinecke* v. *The Secret*, 3 Fed. Rep. 665, 667, and in *The Mary Morgan*, 28 Fed. Rep. 196, 201. The existence of the lien must therefore be denied.

But I should be brought to the same result if I were to adopt a broader construction of the statute, and interpret and give effect to it upon the

principles of courts of law and equity. It is a condition to the acquisition of a valid lien upon the property of another that it should be acquired in good faith and with due respect to his rights. It has already been pointed out that by a familiar rule of construction, of general application, the subordinates mentioned in the statute as the persons upon whose contracts a lien will attach upon the ship are those standing in the relation of agents to the owner. Under ordinary circumstances, the subordinates, being employed about and upon the ship, might fairly be presumed to have the owner's authority, and the party supplying would have his lien, because he has trusted to appearances for which the owner was responsible. But the merchant is presumed to know that it is a common thing for a vessel to be hired, and to be managed and used, in the employment of others, under charter-party with the owner or otherwise, under circumstances where the obligation for supplies does not rest upon the owner. And if the facts presented to him are sufficient to induce a reasonably prudent man, having a just regard to the rights and interests of others, to suppose it probable that the owner is not employing the vessel, but that it is in the service of another, under charter or other agreement involving the payment of charges and expenses by the charterer or lessee, he is bound in good faith to inquire. When the circumstances denote that the owner of the vessel is not the party for whose interest the supplies are furnished, and would not be at fault if they were not paid for, it would be inequitable that a merchant should have the right to give credit to another, and assert a lien therefor, contrary to the stipulations and interests of the owner. And, in my opinion, the same rule requiring the exercise of good faith is applicable in giving due construction and effect to the clause found at the end of section 4286, Rev. St. U. S.,—a section forming part of the provisions of the law limiting the liability of shipowners, if, indeed, that clause has a wider scope than the immediate subject-matter with which the context deals. The merchant is under no obligation to furnish the supplies. He may do so or not, and he may sell for cash or on credit, as he thinks advantageous to himself. If he does furnish and on credit, in the face of an agreement between others of which he has notice, devolving the obligation of payment upon another than the owner, and denying to the charterer the right to hypothecate the ship, he ought not to be allowed to assert a lien upon the owner's property. And, in my opinion, the facts were here sufficient to apprise the libelants that the vessel was not in the service of the owner, or at least to have put them upon inquiry as to how the fact was. They had notice of its place of enrollment by the name thereof painted upon the stern. *The Martha Washington*, 1 Cliff. 463; *The Superior*, 1 Newb. Adm. 181. They knew that the supplies were furnished in the expectation of payment from the Salt & Lumber Company of Detroit. They knew that credit had been given by themselves to that company, and extended, for supplies previously furnished. All the circumstances indicated that the Salt & Lumber Company were acting in their own interest, and not as agents. Their giving their own paper on extended time was strong evidence of this. There is a moral probability arising from the fact that they knew

the Salt & Lumber Company had, for a considerable time, been engaged in an extensive business involving the employment of vessels. Express notice of want of authority to make such a contract as will hypothecate the vessel is not necessary to defeat an attempt to accomplish that end. The language of Mr. Justice CLIFFORD, in delivering the opinion of the court in *The Lulu*, 10 Wall. 192, 201, is applicable here, where he says, in discussing the obligation of good faith which the merchant or lenders must observe:

"It is well-settled law that a party to a transaction, where his rights are liable to be injuriously affected by notice, cannot willfully shut his eyes to the means of knowledge which he knows are at hand, and thereby escape the consequences which would flow from the notice if it had actually been received: or, in other words, the general rule is that knowledge of such facts and circumstances as are sufficient to put a party upon inquiry, and to show that, if he had exercised due diligence, he would have ascertained the truth of the case, is equivalent to actual notice of the matter in respect to which the inquiry ought to have been made."

As may be observed, in reaching the conclusion at which I have arrived, I have waived (as I have several other questions which have presented themselves along the way) all consideration of the grounds of defense of payment, or suspension of the right of action, by the giving and receiving of time acceptances of the Potts Salt & Lumber Company for the supplies in question, which had not matured when the libel was filed. For the reasons given I am of opinion that the libelants must fail upon the principal issues in the case, and that the libel should be dismissed.