## THE SIRIUS.

## WILLIAMS v. THE SIRIUS.

(District Court, N. D. California. January 2, 1895.)

No. 11,101.

ADMIRALTY—MARITIME SERVICE—WATCHMAN.

The service rendered by a watchman, employed to care for and clean the machinery and maintain a general care and supervision of a vessel lying at her home port, out of commission, and with no voyage in contemplation, is not maritime.

Libel in rem for balance of wages as ship keeper of a vessel in her home port, and not engaged in navigation, present or prospective. Libel dismissed, the service rendered not being maritime.

Walter G. Holmes, for libelant.

Andros & Frank, for claimant.

MORROW, District Judge. The libel in this case was brought to recover the sum of $176.25, claimed to be a balance due the libelant for services rendered in taking care of the engine and boilers of the steam vessel Sirius. The testimony established that the libelant was employed from May 23, 1893, to September 4, 1894, by claimant, at $40 per month. His earnings for this period aggregated $616, of which he acknowledges having received $439.75, and he now seeks to enforce a lien on the vessel, under the state statute, for the remainder. It is averred in the libel that the Sirius is a British vessel. This is denied by the answer, and it is therein alleged that the vessel is now, and was at all the times in the libel mentioned, wholly owned by the claimant, who was then, and still is, a resident and citizen of the city and county of San Francisco, state of California, and that said last-named place is her home port. On the hearing it was developed that the Sirius had formerly carried the British flag; that she was sold at this port to the claimant under a venditioni exponas issued out of this court; that her register as a British vessel has been canceled; that she is now, and was during all the time Williams was employed on her, out of commission; and that up to the time of filing the answer she had not been enrolled as an American vessel. The facts of the case show further that Williams had been acting as engineer of the vessel for some 11 months previous to the time of the sale; that when the claimant bought the vessel he engaged the libelant to look after and care for her engine and boilers, and to exercise a general supervision over her. In connection with this employment, he also acted as watchman in relieving the deck watchman. But it would seem that this latter service was rather incidental to his chief occupation of looking after the machinery of the vessel. The deck watchman testified that he watched the deck, while Williams watched the engine. The Sirius was not then engaged in navigation, nor, so far as the evidence discloses, were there any immediate pros-

pects of her doing so. She was without a register, and when Williams was employed, and during the continuance of his employment, she was lying idle in the Straits of Carquinez, being floated twice a day by the tide. The evidence does not show that the libelant rendered any maritime service connected with the navigation of the vessel, either present or prospective. His duties consisted and were confined to taking care of the engine and boilers, and looking after the vessel in general. He was by occupation an engineer, but there is nothing to show that he rendered any services as such, other than in the taking care of the machinery so as to prevent the accumulation of rust and unnecessary decay and deterioration. In fact, it does not appear that the vessel was even once moved from her anchorage during the entire time of libelant's employment. The mere fact that he was an engineer by occupation does not alter the real character of his services in the present case, which is ordinarily known as that of "ship keeper." The claimant contends that the libelant was, to all intents and purposes, a watchman, but I deem it immaterial to the decision whether he be called a ship keeper or a watchman. The principles of admiralty law applicable to both of these services, so far as this case is concerned at least, are substantially the same. It is conceded by claimant that the libelant was employed to take care of the engine and boilers, and to look after the vessel generally, at $40 a month for the period above stated; but it is claimed that the services rendered were not of such a maritime character as would justify this court to take cognizance of a libel to recover wages for the same. The answer also sets up that the libelant performed his work so carelessly and negligently that the engine and boilers became rusted and "pitted," to claimant's damage in the sum of $176.25, an amount equal to that claimed by libelant as his balance of wages. The testimony of the deck watchman and of other witnesses would seem to indicate that the libelant was delinquent in his attention to the duties of his employment, and that through his carelessness and negligence the engine and boilers became rusted and "pitted." It was testified that the damage done would amount fully to $200. On the whole, the testimony against the libelant on this matter is of such a character that, if the case were to be disposed of on the merits, I should feel inclined to allow the claim for damages as an offset to the balance of wages claimed by libelant. But, the question of jurisdiction having been raised, that feature of the case must be considered and determined.

The claimant contends that the service which libelant rendered, whether it be called that of a watchman or ship keeper, was not of a maritime nature, and that, therefore, this court, as a court of admiralty, has no jurisdiction over the cause of action for balance of wages arising from such employment. The libelant, on his part, claims that he rendered a maritime service, for which he claims to be entitled to a lien by virtue of the state statute. Section 813 of the Code of Civil Procedure provides that "all

steamers, vessels, and boats are liable: (1) For services rendered on board at the request of, or on contract with, their respective owners, masters, agents, or consignees." The question, therefore, to be considered is, was the service which libelant rendered a maritime service? We begin with the elementary proposition that the test of admiralty jurisdiction over causes of action arising from contracts is not the locality of the performance of the contract, but its subject-matter. It is a cardinal principle of admiralty jurisprudence that, to give a court of admiralty jurisdiction over contracts, the subject-matter thereof must be maritime. It is not enough that the service which sprang from the contractual relation be performed on water, or even that it be done on board, and for the benefit, of a vessel which is afloat. These are not the exclusive tests. The service arising from the contract must be of a maritime character, and I might add not nominally, but substantially, so. The expression "maritime character" or "nature" is held to mean any act which contributes to the navigation of the vessel, presently or prospectively. This is rather a broad and indefinite statement, but the needs of vessels in navigation are so complex and diverse that it is difficult to give an exhaustive, and at the same time accurate and intelligible, definition. However, Judge Betts, in Cox. v. Murray, Abb. Adm. 340, Fed. Cas. No. 3,304, gives one an excellent idea of the scope of the expression as applied to contracts. He says:

"The subject-matter of the contract—the substantial object and end—must pertain to navigation, or be connected with transactions performed by vessels on the sea, to become maritime in its nature, and be clothed with the privilege of a remedy in admiralty courts; and it appears to me that an agreement acquires this maritime quality only when the matters performed or entered upon under it pertain to the fitment of a vessel for navigation, aid and relief supplied her in preparing for and conducting a voyage, or the freighting or employment of her as an instrument of a voyage. Collateral contracts with or assistance by services or advances to an owner or master, incidentally benefiting a voyage, acquire no special property thereby which renders them maritime."

In Gurney v. Crockett, Abb. Adm. 490, Fed. Cas. No. 5,874, the same learned judge said:

"The line of discrimination between cases which are maritime in their nature and those not so is exceedingly dim and vague, and in the contested state of admiralty jurisdiction in respect to these border subjects it is most desirable to keep within the limits of the clear powers of the court. Manifestly not every contract in relation to maritime matters falls within the cognizance of maritime courts, and, without attempting to define with strictness the terms within which the jurisdiction of admiralty courts is circumscribed, it may be safely asserted that, to impart a maritime character to a subject relating to personal services in vessels, it must be connected with the reparation or betterment of the vessel, or be rendered in aid of her navigation, directly by labor on the vessel, or in sustenance and relief of those conducting her operations at sea."

The libelant, we have seen, rendered the service of a ship keeper in the home port of the vessel. He was hired particularly to take care of the engine and boilers, and also to look after the vessel in general. In this he was assisted by a deck watchman. How his duties, assuming them to have been efficiently rendered, con-

tributed to the navigation of the Sirius, it is difficult to see. The vessel was not then engaged in navigation. She could not do so, being out of commission. She was laid up, without cargo, or even master and crew. Giving the libelant's claim the most favorable consideration, it can only be said that his services tended to the preservation of the vessel, so that when she should be enrolled as an American vessel she might be fitted out for a voyage less expensively and more expeditiously. But such service did not contribute to the navigation of the vessel. Merely keeping a vessel in safe custody, protecting it from the depredations of thieves or the danger of fire, or preserving her machinery from unnecessary decay and deterioration, does not, of itself, constitute a maritime service. It must be connected with the navigation of the vessel. It is difficult to see, therefore, upon what ground it can be said that the libelant rendered a service of a maritime nature. His services did not contribute to the present navigation of the vessel, because she was then laid up; nor to her prospective navigation, because she had no voyage in contemplation. To be sure, it concerned the vessel, but it did not concern the vessel with reference to her navigation, present or prospective. Looking at the question in the light of the authorities, we find that, although there has been, and is yet, some conflict as to whether a mere ship keeper or watchman can be deemed to have rendered a maritime service, the weight of authority is against the right of individuals performing such services to a vessel in her home port to recover in a court of admiralty, for the reason that it is not regarded as a maritime service, within the signification of that term. But the cases, while establishing this general rule, have also created exceptions which, if given full latitude, may become almost as wide as the rule itself. The reason for the exceptions is that, if the ship keeper or watchman, in connection with his duty as such, render any distinctively maritime service, such as moving the vessel to a different anchorage, or preparing or fitting her out for a voyage, or in brief any service connected with the navigation or voyage of the vessel, then the court of admiralty will not only take cognizance of the maritime service rendered, but, if it be sufficiently broad and pronounced, will treat the entire service as maritime. That these adjudications tend to confuse the subject, there can be no doubt. This conflict is due to the fact that the claim of a ship keeper is on the very border line of admiralty jurisdiction, and decisions must rest to a very large extent on the peculiar facts of each case, rather than upon the application of principles. Two of the earliest cases which are cited in support of the maritime character of the services of a ship keeper are The Harriet, Olc. 229, Fed. Cas. No. 6,097, and The George T. Kemp, 2 Low. 482, Fed. Cas. No. 5,341. The case of The Harriet involved the claim of a watchman employed on a domestic vessel. It was conceded that the libelant was a mere laborer on shore, not a mariner, and in no way attached to the ship; that he slept on board nights, and

watched her during the day; and that she was moored at the wharf in a dismantled state. Judge Betts held that the libelant was not entitled to a lien by the maritime law for the services he rendered. He said:

"When no materials are furnished or labor bestowed in the refitment or reparation of vessels, services which are entitled to take the rank and character of maritime must be such as are performed in aid of the navigation of the vessel or the ship's company, or in furtherance of her appropriate business, and are rendered whilst she is employed afloat upon tide waters."

But the judge held that the libelant was entitled to a lien by the state law. The case of The George T. Kemp, supra, did not involve the claim of a ship keeper or of a watchman, but that of a stevedore. Judge Lowell gave the decision, and he criticised the case of Gurney v. Crockett, Abb. Adm. 490, Fed. Cas. No. 5,874, which denied the right to recover in a court of admiralty compensation for such services, as being too narrow in its discrimination between what are maritime and what are not maritime services. But his statement that the claim of a ship keeper is a maritime one is dictum, and he refers to no case excepting The Harriet, supra. The case of Gurney v. Crockett, above referred to, is in point, and is valuable in that it is a decision by Judge Betts, rendered four years after his determination of The Harriet, in which he considers at some length the character of the service rendered by a ship keeper, and comes to the conclusion that a mere ship keeper, who simply looks after the vessel, and renders no service of a distinctively maritime character, cannot obtain a remedy in a court of admiralty: The libel there was in personam, and thus gives additional force to the judge's decision. He makes no allusion to his ruling in The Harriet, where he held that although, under the maritime law, a ship keeper had no lien, still, if the local statute gave a lien, it could be enforced in a court of admiralty. But as, in Gurney v. Crockett, he holds that the claim of a ship keeper is not cognizable in a court of admiralty, it not being for a maritime service, this amounts to a practical repudiation of his former decision. After adverting to the uncertain condition of the admiralty jurisdiction with reference to some services rendered to vessels, he says:

"A ship keeper is ordinarily nothing more than a watchman having guard of a vessel anchored in harbor, or lying at a wharf or in a dock. In the present instance the libelant did not remain on board by night or by day. His duty was to repair occasionally to the schooner, at her anchorage, to see to her safety, open her doors and hatches for ventilation, and to try her pump. I advert to his casual resort to the vessel, not for the purpose of suggesting a distinction between this case and that of a keeper stationed on board, but to mark the description of services connected with his employment, and to ascertain whether they have the characteristics of maritime. Evidently these duties are in no respect nautical. They can be fully as well performed by shore laborers as by seamen; and the libelant in this instance, it appears, was a common stevedore. The services are distinct from the navigation of the vessel, ceasing when that commences, and have the same character and importance on board a hulk under keeping to be broken up or destroyed as upon a vessel preparing or intending for sea. Sweeping and scrubbing the decks, throwing out and securing lines for her fastening, or keeping watch on the wharf against robbery, fire, and other injuries that might reach a vessel from the

shore, are services rendered towards her preservation of like nature with those of ordinary keepers. No principle ever yet announced seems, however, to range services of that description under admiralty jurisdiction."

And in conclusion he says:

"In my view of this claim, it is for mere labor, not for the reparation or fitment of the vessel, and in no respect maritime, as being nautical in its character, or distinguishable from ordinary services rendered in going to and from the vessel, or incidental to her probable employment at sea. I shall therefore disallow the claim entirely in this action."

But he allowed the libelant a small sum for performing a maritime service while keeper, which consisted in moving the vessel from her anchorage further out into the bay by the direction of a health officer. To do this the libelant was compelled to get under way and navigate her to the designated place. This, the judge held, "was comparatively a small service, but it was in its nature maritime, and the libelant had a right to resort to this court to receive a proper compensation for it." In the case at bar there was nothing to show that the Sirius was even once moved from her anchorage. In The Island City, 1 Low. 375, Fed. Cas. No. 7,109, Judge Lowell held, in 1869,—seven years prior to his criticism of Gurney v. Crockett, supra,—that a ship keeper of a domestic vessel, which was being repaired for a new use, had no lien on her for his wages by the general maritime law. The learned judge said:

"Nor has Holden a lien. He was a ship keeper, and made himself useful in taking care of the machinery, etc. The contract with such a person has been decided not to be maritime. The Thomas Scattergood, Gilp. 1, Fed. Cas. No. 11,106; The S. G. Owens, 1 Wall. Jr. 359, Fed. Cas. No. 17,310. I do not fully agree with those judgments in their application to a foreign vessel, but in such a case as this they are sound."

The service which the libelant rendered in that case was very similar to those in the case at bar. The case of The Thomas Scattergood, Gilp. 1, Fed. Cas. No. 11,106, cited by Judge Lowell, is also in point. There the first officer, after the return of the vessel from her voyage and the discharge of her cargo, continued on board, and took care of the vessel. For this he claimed wages as a continuation of his duties as first officer. But Judge Hopkinson held that, as the voyage was ended, and the vessel had ceased earning freight, the admiralty had no jurisdiction over the service as a maritime one. He said:

"It is a contract neither made at sea nor for a service to be performed at sea. Both were in the port of Philadelphia, within the body of the county of Philadelphia. The ship was safely moored at the wharf. She had returned to the possession of the owners. The service had no agency in bringing her in. She had ceased to earn freight. The contract between the owners and the seamen had expired. The relation and rights created by that contract were dissolved. It is true that the same parties might make a new contract, but they could not extend the old one beyond its legal limits, nor give to the new one a character and privileges which the law denies to it. The place and subject-matter of a contract decide its maritime character, and not the will of the parties. Is there an instance in which a contract made on land, for a service to be rendered on land, having no connection with any voyage performed or to be performed, has been deemed, by the general admiralty law, a case of admiralty jurisdiction, giving a lien on the ship? The meritorious

service of the petitioner, if such it was, and the hardships of the case, have been strongly pressed in his behalf, but they must not be permitted to unsettle established principles, or to remove the landmarks of judicial jurisdiction."

The claim of the libelant was dismissed. The case of The Champion, Fed. Cas. No. 2,584, is also in point, and is a later decision (1877). The facts of that case are: That a seaman shipped on the vessel in the spring, served as such during the season of navigation, and then remained on board during the winter, taking care of the ship. No new contract for this service was entered into, nor was there any change of wages. The services were continuous, and small sums were paid from time to time. The contract of hiring as seaman was made in Canada, and the vessel plied between Canadian ports, touching occasionally at American ports. The libelant intervened while the vessel was in the custody of the marshal for the Eastern district of Michigan. He was an American citizen, and the court determined that, as it had the proceeds of sale in its possession, it had jurisdiction to entertain the claim, notwithstanding the contract of hiring was made in Canada, and the services as keeper rendered there. Judge Brown, in alluding to the conflict of authority on this question, said:

"Notwithstanding some conflict of authority, I think the better rule is that a ship keeper, particularly of a domestic vessel, has no lien upon her for wages by the general maritime law. It was so decided by Judge Lowell in the case of The Island City, following in this respect Phillips v. The Thomas Scattergood (Gilpin, J.); Weaver v. The S. G. Owens, Fed. Cas. No. 17,310. See, also, The John T. Moore, Fed. Cas. No. 7,430. In the case of The Trimountain, Fed. Cas. No. 14,175, the court allowed a watchman for his fees before she was taken into custody by the marshal, giving as a reason that that constituted one of the privileged demands of the maritime law, as administered under the ordinance of Louis XVI. [XIV.], and was so ranked in the Code de Commerce. In the case of The Dolphin, Fed. Cas. No. 3,973, I held that the underwriter had a claim on that vessel for his premiums, following in this respect French law. But the supreme court had already determined the contract of insurance to be a maritime contract, and it seemed to me the lien followed naturally upon this decision, and, inasmuch as the civil law conferred the lien, I considered myself at liberty to adopt it. I did not intend, however, to decide that the courts of this country would give a lien in every case where it was given by the Commercial Code of France. Indeed, many of these liens, particularly those for the wages of the master, for supplies furnished for domestic vessels, and for the expense of building and equipping, have been held by the supreme court not to exist in this country. Where the contract is maritime, I should be very reluctant to deny the lien, but where, as in this case, the services are rendered, not in aid of the navigation of the vessel, but while she is laid up for the winter, it seems to me the service is not maritime, and consequently that the party is not entitled to his lien. Nor do I think the lien is saved in this case because no new contract was made, but the party remained on board during the winter, without having been paid in the fall for his services as cook. Had his services as watchman been performed merely as an incident to the navigation of the vessel, and while she was lying up in some port, it would have been saved by the rulings in such cases as The Gazelle, 1 Spr. 378, Fed. Cas. No. 5,289; Pitman v. Hooper, 3 Sumn. 286, Fed. Cas. No. 11,186; Brown v. Lull, 2 Sumn. 443, Fed. Cas. No. 2,018; The Jane and Matilda, 1 Hagg. Adm. 187; The Canton, 1 Spr. 437, Fed. Cas. No. 2,388. But the contract as cook and seaman terminated with the season of navigation and with the discharges of the crew, and, if libelant remained on board while the vessel was laid up in winter quarters, he must be held to have remained, by im-

plication, under a different contract. Although no new contract was actually made, circumstances had intervened which put an end to the first contract, and he must be held to know that, if he remained on board during the winter, it was not in the capacity of a seaman or cook."

In The E. A. Barnard, 2 Fed. 712, Judge Butler affirmed the report of Henry P. Morton, author of the excellent work on Admiralty Jurisprudence and Practice, who, as commissioner, reported upon the claim of a watchman and ship keeper for services rendered in the home port of the vessel. The commissioner held that the services of watchman and ship keeper rendered in that case were not maritime. The views of the commissioner are not referred to, nor are the circumstances of the services stated, and the court does not enter into a discussion of the reasons for not recognizing the services as maritime. The latest reported decision which holds that for services rendered to a vessel in her home port as watchman or ship keeper there is no maritime lien is The America, 56 Fed. 1021. In that case Judge Green said:

"This claim is a meritorious one, and should be paid. The services for which wages are claimed by the libelant were faithfully performed, and should be compensated for. But, unfortunately for the libelant, he has mistaken his remedy for the wrong done him. The libelant was employed simply as a ship keeper or watchman of the dredge America, a domestic vessel, while she was lying in port. Such employment, and the consequent services rendered, are not maritime, and cannot be the basis of a maritime lien. The E. A. Barnard, 2 Fed. 712; The Island City, 1 Low. 375, Fed. Cas. No. 7,109. The libel must therefore be dismissed."

Of the cases cited by counsel for libelant in support of his position that the service rendered by Williams was maritime, not one of them holds, under facts at all analogous to those in the case at bar, that the service is of a maritime character. In every one of them the court places its decision, not upon the fact that the libelant rendered services as a mere watchman or ship keeper, but because, in the discharge of his duties as such, he rendered a distinctive and substantial maritime service, or, to put it in a more general way, his services were connected with the navigation of the vessel, present or prospective. Take the case of The Maggie P., 32 Fed. 300. There a libel was instituted against a vessel lying in the port of St. Louis, which was her home port. The libelant claimed wages for the services of a watchman. The case came up for decision on exceptions to the libel on the ground that it did not state a maritime cause of action. It was averred in the libel that it was the duty of the libelant to keep the steamer in a place of safety, and to that end to move and navigate her from place to place, as circumstances demanded, and that on several occasions he did procure a tug to move her from one anchorage to another, to insure her safety. Judge Thayer held that the services of the watchman in the case before him was a maritime service, and that the entire demand grew out of a maritime contract. In The Jos. Nixon, 43 Fed. 926, the libelant had been the master of the towboat by that name. At the end of a trip, he was hired to take exclusive custody and care of her while she remained moored at Pittsburgh, her home port, and to put and keep her in good order, and fit her to proceed on an anticipated voyage;

all of which he did. He remained on board day and night. It was necessary to move the boat into shore and out therefrom as the river rose and fell, and the chief perils to which the boat was exposed, and from which she was to be protected by the libelant, were perils of the river. Judge Acheson held that the libelant undoubtedly had a lien by virtue of the state statute, and considered the question whether he could recover in rem in a court of admiralty for such services. Respecting the duties of the libelant, the learned judge said:

"The libelant was called a 'watchman,' but he was much more, and, indeed, his services went far beyond those of an ordinary ship keeper."

After rehearsing all the facts connected with libelant's employment, as were above briefly stated, he comes to the conclusion that the service of the libelant was essentially maritime, and he says:

"The contract related to a vessel afloat and about to proceed on a voyage, and it concerned not only her preservation from marine dangers, but her reparation, and the fitting of her for navigation. The libelant's services directly promoted all those objects. The principal dangers to which the boat was exposed, and from which she was to be protected, were perils of the river. The services in that regard here rendered were not those of a landsman. They could be performed properly by a mariner only."

The service rendered by the libelant in the case at bar cannot be deemed to rise to the same level. His duties had nothing to do with preparing or fitting the Sirius for a prospective voyage, or protecting her from any known perils.

The Hattie Thomas, 59 Fed. 297, is also cited. But in that case the services performed were not those of a mere watchman or ship keeper to a vessel laid up in her home port, but they were of a substantial maritime character. Judge Townsend, after referring to a number of cases showing the conflict existing on the subject, says:

"It will thus be seen that the later decisions give a lien to stevedores, longshoremen, watchmen, and ship keepers against foreign vessels, while the authorities are in conflict as to whether such lien exists against domestic vessels. In some cases the question seems to have been determined by the maritime or nonmaritime character of the services; in others, by ascertaining whether the services were performed on the credit of the master or of the vessel. I am unable to find any case where such lien has been denied under circumstances like those in the present case. The services for which the charge of $30 was made included bringing the schooner into the port of Branford, laying her up, moving her about, pumping her out, and drying her sails, in the expectation, warranted by the statements of the son of the master, that the schooner might shortly again start on her trips. Other services, it is true, were merely those of landsmen, but I do not think they should affect the right of the libelant to recover for such maritime services as would naturally be rendered only by a seaman. It seems to me that the principle deducible from the cases establishes that, where services are rendered in the home port of the vessel, the question whether there is an admiralty lien, irrespective of statute, depends largely upon whether the services are in the nature of repairs or supplies or other necessaries for the vessel, such as are furnished by material men, or are such in kind as would be rendered by a mariner. If they are of the latter character, it seems that they are of equal rank with those of other seamen, and constitute a lien against the vessel. It is further important to inquire whether the services concern the cargo or freight or the vessel itself or her maritime duties, and, if the latter, whether they are connected with her navigation, present or prospective. Assuming these tests to be correct, and applying them to the case at bar, it will be found that the services rendered were such as to entitle the libelant to the lien of a seaman."

If we apply the tests of the learned judge to the facts of the case at bar, we find it difficult to see wherein the services of the libelant resembled those of a mariner, or concerned the cargo or freight of the vessel, or her maritime duties in connection with her navigation, present or prospective. The services which he did render—those of looking after and caring for the machinery of the vessel, and exercising a sort of general supervision over her—were entirely disconnected with her navigation. And this distinction seems to run through all the cases which hold that a watchman or ship keeper is entitled to a maritime lien. I have been unable to find any case which determines that a watchman or ship keeper is entitled to a lien in admiralty, or performs a maritime service, simply because he watches over and guards a vessel. In all the cases cited where a lien has been given, the ship keeper or watchman did something more. He actually performed maritime services, and in some instances very substantial nautical services. While the ruling in Gurney v. Crockett, supra, may be criticised as being narrow, in view of the somewhat liberal interpretation as to what constitutes a maritime service at the present day, still, relying upon the authorities subsequent to that decision, I am not convinced that a mere ship keeper, in charge of a vessel in her home port, out of commission, and laid up, not engaged in navigation, and having no voyage in contemplation, has a maritime lien by the general admiralty law. Nor has he a lien by the state statute, since his services are of a nonmaritime character. The Lottawanna, 21 Wall. 558; The Guiding Star, 18 Fed. 263; The Samuel Marshall, 49 Fed. 754; Id., 4 C. C. A. 385, 54 Fed. 396; The Alvira, 63 Fed. 144. Where some maritime exigency renders it necessary to employ a watchman or ship keeper, a court of admiralty will treat such services as maritime, and afford a remedy in rem, as was done in The Erinagh, 7 Fed. 231. Judge Choate there said:

"Whatever may be the rule upon the facts of those cases where the vessel was laid up undergoing repairs, dismantled, or not engaged in any voyage, or earning freight, I have no hesitation in holding that it is in accordance with the present view of what constitutes a maritime contract that the services of a watchman on board a vessel coming into port utterly disabled by the sickness of her crew, and having on board a cargo to deliver in order to earn her freight, is a maritime service, for which there is a maritime lien on the ship."

The case of The Seguranca, 58 Fed. 908, has also been cited by counsel for libelant. But the question there was not whether watchmen watching the cargo of a vessel in her home port, before its delivery, had a lien, but it was whether a contractor who furnished such watchmen to the vessel had a lien. The court held that he had not. In the course of his opinion Judge Brown further stated that, were the libelants seeking to enforce a lien for wages for their personal services as watchmen, he should feel bound to sustain their claim. He bases this statement on the ground that watchmen and stevedores, when employed by the ship's representative, on her credit, may have a lien for their wages in enabling the ship to earn her freight, even in the home port, as analogous to the wages of seamen, to pilotage, towage, or wharfage. While the views of that eminent

judge would have great weight with the court were the facts similar, yet a brief quotation from his opinion will serve to show that the facts of that case and the one at bar are entirely dissimilar.   Judge Brown said:

"The petition and proofs show that in December, 1892, they [the contractors] supplied several different persons as watchmen to watch the cargo of the Seguranca, which was lying at Roberts' stores, in Brooklyn, until the cargo could be delivered to the consignees. Some of the cargo, as I understand, was on the dock, and some on board of the vessel."

In speaking of the character of their services, he uses this language:

"The personal services of watchmen or stevedores, on the other hand, in cases like the present, are necessary to enable the ship to discharge her maritime duty, to accomplish her voyage, and to earn her freight. They are rendered in the course of the voyage, since the voyage is not ended, as regards the goods, until they are delivered, or ready for delivery. See The Mattie May, 45 Fed. 899, and The Scotia, 35 Fed. 916. It is but right that the same lien should be allowed for the wages of the substitutes, who are employed merely for greater safety, skill, and economy."

It would be useless repetition to refer to the facts of the case at bar to show that they are not analogous to those of the Seguranca.

A number of cases bearing upon the maritime nature of the service rendered by a stevedore have been referred to and pressed upon the court as authority for giving the libelant in this case a remedy in rem in this court.   But the cases are not analogous in principle. Whatever doubts were formerly entertained as to the maritime character of a stevedore's employment, that doubt has been effectually dispelled in his favor; but the reasons for giving a stevedore a maritime lien are much stronger than are those for a ship keeper or watchman, since the employment of the former has relation to the handling of the cargo or earning of the freight.   The Windermere, 2 Fed. 722;  The Canada, 7 Fed. 119;  The Circassian, 1 Ben. 209, Fed. Cas. No. 2,722;  The George T. Kemp, supra;  The Hattie M. Bain, 20 Fed. 389;  The Scotia, 35 Fed. 916;  The Gilbert Knapp, 37 Fed. 209;  The Main, 2 C. C. A. 569, 51 Fed. 954.   I must therefore conclude, both upon principle and authority, that the particular service which libelant rendered in this case as ship keeper had no connection with the navigation of the vessel, either present or prospective; and that it was not, of itself, of such a maritime character as to bring a claim for wages based on such employment within the admiralty jurisdiction of this court.   The libel will be dismissed.